939 A.2d 855

**WESTMORELAND INTERMEDIATE UNIT # 7, Appellee,**

v.

**WESTMORELAND INTERMEDIATE UNIT # 7 CLASSROOM ASSISTANTS EDUCATIONAL SUPPORT PERSONNEL ASSOCIATION, PSEA/NEA, Appellant.**

Supreme Court of Pennsylvania.

Argued Sept. 11, 2006.

Decided Dec. 27, 2007.

650

Richard Scott McEwen, Esq., for Westmoreland IU #7 Classroom Assistants Educational Support Personnel Association.

Michelle F. Duggan, Esq., Thomas W. Scott, PA State Education Association (PSEA), for Pennsylvania State Education Association.

John M. Ranker, Esq., for Westmoreland Intermediate Unit #7.

Emily J. Leader, Esq., Pennsylvania School Boards Assn., Harrisburg, for amicus curiae Pennsylvania School Boards Association.

BEFORE: CAPPY, C.J., and CASTILLE, NEWMAN, SAYLOR, EAKIN, BAER and BALDWIN, JJ.

## OPINION

Chief Justice CAPPY.

In this appeal by allowance, we review whether the Commonwealth Court properly applied the standard of review applicable to review of a grievance arbitrator's award rendered under the Public Employe Relation Act, 43 P.S. § 1101 et seq. ("PERA"). For the reasons that follow, we reaffirm the essence test as the proper standard to be employed by a court when reviewing a grievance arbitration award; adopt a public policy exception to that test; reverse the decision of the Commonwealth Court; and remand the matter for further proceedings consistent with our opinion today.

The facts underlying this appeal are as follows. Sherie Vrable began her employment with the Westmoreland Intermediate Unit # 7 ("Intermediate Unit") on October 28, 1978. She worked for the Intermediate Unit for over 23 years as a classroom assistant with no discipline prior to her termination. For the 2001/2002 school year, Ms. Vrable had successfully bid on the position of Classroom Assistant in the emotional support classroom taught by Cynthia Pierce, an IU Special Education Teacher located in the West Newton Elementary School in the Yough School District in Westmoreland County, Pennsylvania.

Ms. Vrable reported to work on March 18, 2002. On this day, Ms. Vrable was responsible for assisting Ms. Pierce with eleven emotionally disturbed children in grades three through five. Ms. Vrable complained when she arrived at school that she was not feeling well. At approximately 9:30 a.m., Ms. Pierce asked Ms. Vrable to take two sets of materials to the copy room in the library to make copies. Ms. Vrable agreed to do so and left the classroom. Approximately fifteen minutes later, Ms. Vrable returned to Ms. Pierce's classroom with the copies from one set of materials and advised Ms. Pierce that she was getting worse and that she was going to call a substitute to work for her the rest of the day. Ms. Pierce

indicated that this was acceptable, but that that Ms. Vrable was to inform her of what arrangements she had made prior to leaving. Ms. Vrable advised Ms. Pierce that she would retrieve the second set of materials being copied and would call for a substitute. Ms. Vrable left Ms. Pierce's classroom.

After approximately forty-five minutes, Ms. Pierce realized that Ms. Vrable had not returned. She sent a student with a note to the copy room and to the nurse's office to find Ms. Vrable. Evidently, Ms. Vrable entered Preschool Special Education Teacher Denise Fischer's classroom and offered to do some tracing. Ms. Vrable left with the materials to do so. Approximately fifteen to twenty minutes later, School District Aide Patty Beraducci entered Ms. Fisher's classroom and asked if all Intermediate Unit staff was accounted for. Ms. Beraducci explained that an unidentified individual had been in the restroom for an extended period of time. Ms. Fischer left her classroom and went to the door of the restroom. She knocked on the door and called Ms. Vrable by her name. Upon calling her name, Ms. Vrable let out a moan. Ms. Fischer asked Ms. Vrable to open the door and explained that if she would not open the door, she would have to call 911 and Ms. Vrable's mother. When Ms. Vrable failed to further respond, Ms. Fischer advised Ms. Beraducci to contact the Principal, Joyce Speck, and to call 911.

Ms. Pierce arrived at the restroom and attempted to speak to Ms. Vrable, but received no response, but rather only whimpering and crying. When Principal Speck arrived and could not get a response from Ms. Vrable, she instructed her secretary to call 911. During this period of time, Principal Speck placed the school under "Code Blue," a security code under which the school is essentially locked down. During Code Blue, classroom doors must remain closed and students are not permitted out of their classrooms. Furthermore, students are not permitted to be released to use the restrooms, to go to lunch, or to be dismissed from school.

In response to the 911 call, West Newton Police Officer Robert Wilson arrived at the school and proceeded to the restroom. After being unable to gain entry to the restroom

and failing to get a response other than what Officer Wilson believed to be crying, he sought backup from the Rostraver police and directed that an EMS unit be sent to the school. The officers obtained a screwdriver to unlock the restroom door. Once the door was opened, the officers found Ms. Vrable unconscious, partially nude, seated on a toilet, and leaning against a wall. The officers found a large amount of mucous coming from Ms. Vrable's nose and mouth and the sound which was thought to be crying was actually Ms. Vrable choking and attempting to breathe. The nurse and Officer Wilson placed Ms. Vrable on the floor in anticipation of performing CPR. Ultimately, Ms. Vrable was transported by the EMS to a local hospital. Evidently Ms. Vrable was transferred to the mental health unit on March 20, 2002 and was discharged on March 21, 2002.

Police investigation of the incident uncovered that that there was a Fentanyl patch on Ms. Vrable's back and that the patch caused an overdose. Criminal charges were filed against Ms. Vrable for possession of a controlled substance and for disorderly conduct. Subsequently, Ms. Vrable entered into a plea agreement by which she agreed to Probation Without Verdict on the charge of possession and the charge of disorderly misconduct was dismissed. Probation Without Verdict is a probationary program for first offenders accused of non-violent possessory offenses. 35 P.S. § 780–117. No verdict is entered against the defendant and the case is deferred. Upon the successful completion of the terms of probation, the court dismisses the charges against the individual without an adjudication of guilt or a conviction. The possession charge was a misdemeanor.

The Intermediate Unit also conducted an investigation. During this investigation, Ms. Vrable explained that prior to March 18th, her physicians had prescribed several medications for her use including Wellbutrin, Neurontin, Ultram, and Detrol. Ms. Vrable explained that on Sunday March 17, 2002, a friend had given her a Fentanyl patch which she had placed on her back prior to coming to school. Evidently, the Fenta-

nyl patch precipitated an adverse medical reaction which resulted in Ms. Vrable's condition.

On March 27, 2002, the Intermediate Unit's executive director, Bruce Paul, suspended Ms. Vrable without pay. On September 17, 2002, Mr. Paul informed her that the administration had intended to recommend to the Intermediate Unit's Board of Directors that she be terminated from her employment. On September 24, 2002, the Board of Directors approved Ms. Vrable's termination.

On April 4, 2002, the Association filed a grievance on behalf of Ms. Vrable alleging that the Intermediate Unit did not have just cause for her discharge. The grievance was denied and was submitted to arbitration pursuant to the collective bargaining agreement between the Intermediate Unit and the Association. A hearing was held on March 19, 2003 before Arbitrator Elliott Newman. The issue before Arbitrator Newman was whether the Intermediate Unit "had just cause under Appendix C, Section 9(b) [of the collective bargaining agreement] to discharge Ms. Vrable, and if not, what shall the remedy be?"

The collective bargaining agreement between the Association and the Intermediate Unit permitted discharge of an employee only for just cause:

> The employer shall not discharge employee without just cause ... For purposes of this section, just cause shall mean ... any causes not herein enumerated, but included for professional employees in Section 1122 of the Public School Code of 1949. . . .

Appendix C, Section 9, Collective Bargaining Agreement.

Section 1122 of the Public School Code provides: "The only valid causes for termination of a contract heretofore or hereafter entered into with a professional employe shall be immorality. . . ." 24 P.S. § 11–1122. Thus, this provision of the School Code was incorporated into the collective bargaining agreement between the parties. It also was the focus of the question of whether the Intermediate Unit had just cause to terminate Ms. Vrable. Before Arbitrator Newman, the

Intermediate Unit asserted that Ms. Vrable's illegal possession and use of the Fentanyl patch, on March 18, 2002 at the school during school hours constituted "immorality" under Section 1122 of the Pennsylvania School Code.

Arbitrator Newman found that Ms. Vrable's "foolish" and "irresponsible" behavior did not so grossly offend the morals of the Intermediate Unit's community that it rose to the level of "immorality." Thus, Arbitrator Newman found that just cause did not exist under the collective bargaining agreement to terminate Ms. Vrable.

Specifically, as recognized by Arbitrator Newman, "[w]hile there is always a temptation to simply pontificate on the evils of abuse of an improperly obtained prescription drug, including a controlled substance, what happened here was one and only one workplace incident in Ms. Vrable's 23 years with the IU [Intermediate Unit] that reduced to its essence reflects very, very poor judgment." Arb. Award at 7. While it was not right for Ms. Vrable to use the friend's Fentanyl patch, "it does mean that one such incident in a span of 23 years would not be a course of conduct, and when viewed in a rational, detached and dispassionate manner, it would not violate the morals of the community." *Id.* Thus, Arbitrator Newman concluded that the Intermediate Unit failed to establish just cause for the discharge.

Recognizing, however, the gravity of Ms. Vrable's conduct, Arbitrator Newman determined that Ms. Vrable was not entitled to any back pay and made her reinstatement strictly conditional. Reinstatement was conditioned upon: (1) satisfactory completion of the terms and conditions of her one-year probation period and (2) her participation in a Drug and Alcohol Treatment Program and her agreement to be bound by its conditions. Ms. Vrable was to abstain from all mood-altering drugs or chemical substances while on-duty for the school year. Moreover, at the Intermediate Unit's discretion, Ms. Vrable was to be subjected to periodic, unannounced drug/alcohol screening and a positive result would result in immediate removal. Furthermore, Ms. Vrable was required to participate in a counseling and treatment program and to

consent to release information to the Intermediate Unit to allow reports of Ms. Vrable's attendance at and progress in the monitored program. Any breach of the arbitration award would result in Ms. Vrable's immediate dismissal for violation of this "last chance" agreement.

The Intermediate Unit appealed to the Court of Common Pleas of Westmoreland County. The court found that Ms. Vrable's conduct was the type that bore upon the employer's discharge of its public function. As discussed more fully below, this analysis has become known as the "core functions" exception which looks at whether an arbitrator's award impacts the core function of the public entity and would deprive the employer of its ability to discharge that function. *City of Easton v. AFSCME, Local 447*, 562 Pa. 438, 756 A.2d 1107, 1111–12 (2000). The court concluded that the award fell within this exception and vacated the arbitrator's award. The Association appealed the trial court's decision to the Commonwealth Court.

In a two-to-one decision, a panel of the Commonwealth Court affirmed in an unpublished opinion. Specifically, the Commonwealth Court majority, in an opinion authored by Judge Bernard McGinley, first found that the arbitrator's award was not rationally derived from the collective bargaining agreement. The majority offered that the proper standard of review of a grievance arbitration award is the essence test, i.e., whether in rendering an award, the arbitrator's interpretation can rationally be derived from the collective bargaining agreement. Here, as noted by the court, the collective bargaining agreement between the parties prohibited the termination of an employee without just cause. Just cause, under the agreement, included any cause for termination applicable to professional employees found in Section 1122 of the Public School Code. The majority reasoned that one such valid cause for termination under the School Code was "immorality," and immorality has been defined as "a course of conduct as offends the morals of the community and is a bad example to the youth whose ideals a teacher is supposed to foster and elevate...." *Kinniry v. Abington*

*School District,* 673 A.2d 429, 432 (Pa.Cmwlth.1996). The Commonwealth Court majority concluded that the Intermediate Unit satisfied the elements to establish the offense of immorality. According to the majority, this led to the conclusion that the arbitrator's award did not draw its essence from the collective bargaining agreement. Furthermore, the majority offered that our Court has recognized the unique nature of a public employer and has applied the "core functions" exception to whether an arbitrator's award is rationally derived from the collective bargaining agreement. The Commonwealth Court majority concluded that the trial court properly applied the core functions exception when it found that the conduct of Ms. Vrable fell within the conduct that impacted the Intermediate Unit's ability to discharge its public function of educating children.

Judge Dante Pellegrini dissented. According to the dissent, the arbitrator sustained the Association's grievance finding that Ms. Vrable's conduct did not rise to the level of immorality and thus, the Intermediate Unit lacked just cause for discharging Ms. Vrable. The dissent, noting the circumscribed nature of the essence test would have reversed the trial court as the arbitrator's decision was rationally derived from the collective bargaining agreement. Moreover, the dissent concluded that the core functions exception would not apply as nothing in the case showed that the ability of the Intermediate Unit to carry out its ongoing responsibilities was compromised. Here, the one-time-foolish act did not impact the children in any way from receiving services. Importantly, the dissent suggested the possibility that the core functions exception could subsume the essence test if interpreted to permit relief in such situations.

The Association appealed to our Court. We granted allocatur. The Association raises three issues before our Court. First, the Association asks us to examine whether the lower tribunals erred in reversing the arbitrator's award by failing to apply the deferential essence test. Second, the Association questions whether the lower tribunals erroneously applied the core functions exception to the essence test in vacating the

arbitrator's award. Finally, and related thereto, the Association also inquires as to whether the Intermediate Unit waived its argument regarding the core functions exception when it failed to challenge the arbitrability of the grievance before the arbitrator. As these three issues are interrelated, we will address them together.

The arguments of the parties are straightforward. The Association argues that the deferential essence test is the applicable standard of review of this matter and that Arbitrator Newman's award passes this test. Specifically, the Association submits that the arbitrator's ruling in this instance that a one-time error in judgment did not offend the community standards necessary to constitute immorality was proper, as was the imposition of reinstatement with a lengthy unpaid suspension and subjecting her re-employment to numerous conditions. According to the Association, the trial court, and Commonwealth Court's reliance upon the core functions test as an exception to the essence test was improper as that test is inconsistent with a limited standard of review, unnecessary and inapplicable in the public education context, and thus, should be rejected. Even under that test, the Association maintains that the Intermediate Unit failed to demonstrate that the core function of the school was egregiously impacted. Finally, the Association offers that the core functions exception goes to the arbitrability of the dispute, and thus, Intermediate Unit failed to preserve the issue of whether the award was inconsistent with the core function of the school as it did not raise this exception before Arbitrator Newman.

The Intermediate Unit counters that the lower tribunals correctly applied the essence test and properly concluded that the arbitrator's award did not draw its essence from the collective bargaining agreement. According to the Intermediate Unit, it retained absolute authority to terminate an employee whose conduct, here possessing and using a controlled substance at school, undermined its ability to discharge its public function, i.e., vacating the award was appropriate under the core functions exception. Furthermore, the Intermediate Unit submits that it adequately preserved for appeal the issue

of whether it lacked the capacity to bargain away its right to discharge an employee for acting in a way that impairs its ability to carry on its core function.

To resolve the issues before us, it is necessary to consider the role of arbitration under PERA and our treatment of judicial review of grievance arbitration awards.

If the heart of PERA is Section 401, which recognizes the right of certain public employees to organize for purposes of collective bargaining, 43 P.S. § 1101.401, then its lifeblood is the requirement that labor disputes arising under a collective bargaining agreement be resolved by final and binding arbitration. 43 P.S. § 1101.903. As we explained in *State System of Higher Education (Cheyney University) v. State College and University Professional Association (PSEA–NEA)*, 560 Pa. 135, 743 A.2d 405, 409–10 (1999), the resolution of disputes through arbitration is the keystone to workplace peace and stability between parties legally bound in a long-term relationship. In labor relations, arbitration is the preferred method of dispute resolution by parties of a collective bargaining agreement. The arbitration process eschews the lengthy, formal, expensive process that at times are indicative of the more formal dispute resolution process found in our courts. Unlike the judicial system, the parties themselves are the ones who chose the arbitrator who will resolve the dispute and who brings with him or her a familiarity of the unionized workplace. Indeed, the value of arbitration to resolve disputes in a collective bargaining relationship is made manifest by the General Assembly requiring the arbitration of disputes under PERA. 43 P.S. § 1101.903 ("The arbitration of disputes or grievances arising out of the interpretation of the provisions of a collective bargaining agreement is mandatory."). Moreover, the General Assembly requires that the decision of the arbitrator shall be final and binding upon the parties. *Id.* Therefore, final and binding arbitration is not only highly valued in labor relations for its speed, inexpensiveness and efficiency, it is required under PERA.

Related thereto, our Court has recognized that broad judicial review of an arbitrator's award pursuant to PERA would

undercut these attributes of arbitration, and thus, thwart the Legislature's intentions regarding resolution of labor disputes. Specifically, judicial review that would allow the regular vacating of arbitration awards would not only encourage extended litigation through court review of arbitration awards, but it would add time and expense to the process and it would take the resolution of disputes from a person chosen by the parties and give it to a court to decide. *Office of the Attorney General v. Council 13, American Federation of State, County & Municipal Employees, AFL–CIO*, 577 Pa. 257, 844 A.2d 1217 (2004)(*quoting Newark Morning Ledger Co. v. Newark Typographical Union*, 797 F.2d 162, 165 (3d Cir.1986))("[F]requent judicial disapproval of the awards of arbitrators would tend to undermine a system of private ordering that is of the highest importance to the well-being of employer and worker alike."). Perhaps most importantly, it would severely subvert the Legislature's mandate that arbitration awards be final and binding.

Acknowledging the value of limited judicial review and the potential injurious nature of a broad scope of judicial review which would undermine the arbitration process, shortly after PERA's enactment, our Court in *Community College of Beaver County v. Community College of Beaver County, Society of Faculty (PSEA/NEA)*, 473 Pa. 576, 375 A.2d 1267 (1977), addressed the proper standard of review by which to review a grievance arbitrator's award. The standard is one characterized by great deference. The arbitrator's award must be "respected by the judiciary if 'the interpretation can in any rational way be derived from the agreement, viewed in light of its language, its context, and any other indicia of the parties' intention....'" *Id.* at 1275 (*quoting Ludwig Honold Mfg. Co. v. Fletcher*, 405 F.2d 1123, 1128 (3d Cir.1969)).

In articulating the proper standard of review under PERA, our Court determined that the standard of review by the judiciary of a grievance arbitrator's award was consistent with federal case law addressing the same issue. As stated by the United States Supreme Court in *United Steelworkers v. En-*

*terprise Wheel and Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960):

> [A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may, of course, look for guidance from many sources, yet **his award is legitimate only so long as it draws its essence from the collective bargaining agreement.**

*Id.* at 596, 80 S.Ct. 1358 (emphasis added). Thus, from *Enterprise Wheel*, we employ the term "essence test." The deferential essence test, as first formally adopted in Pennsylvania in 1977, has been the proper standard of judicial review for the following thirty years.

Recently, in *Cheyney University*, we reaffirmed the essence test and set forth a clear two-prong approach to judicial review of grievance arbitration awards: "First, the court shall determine if the issue as properly defined is within the terms of the collective bargaining agreement. Second, if the issue is embraced by the agreement, and thus, appropriately before the arbitrator, the arbitrator's award will be upheld if the arbitrator's interpretation can rationally be derived from the collective bargaining agreement." *Cheyney University*, 743 A.2d at 413. We explained: "That is to say, a court will only vacate an arbitrator's award where the award indisputably and genuinely is without foundation in, or fails to logically flow from, the collective bargaining agreement." *Id.* Regarding a review for reasonableness, we rejected such review, finding that it would invite a reviewing court to substitute its own interpretation of the contract language for that of the arbitrator. *Id.* Therefore, we instructed that a court should not engage in merits review of the matter. Indeed, after our reaffirmation of the circumscribed essence test we made it eminently clear that "the essence test does not permit an appellate court to intrude into the domain of the arbitrator and determine whether an award is 'manifestly unreasonable.'" *Pennsylvania Game Commission v. Civil Service Commission (Toth)*, 561 Pa.19, 747 A.2d 887, 891 (2000); *see also Greene County v. District 2, United Mine Workers of*

*America,* 578 Pa. 347, 852 A.2d 299, 305 (2004); *Danville Area School District v. Danville Area Education Association,* 562 Pa. 238, 754 A.2d 1255, 1259 (2000).[1] Thus, the circumscribed essence test is the standard of review by which courts will review grievance arbitration awards arising under PERA.

An issue, however, has previously arisen, and arises again in this appeal, as to whether there should be a limited exception to this highly deferential standard of review. The federal courts, as well as our courts, have considered just such an exception.

Specifically, while the principles established in *Enterprise Wheel* have restrained federal court involvement in the labor arbitration process through judicial deference, the United States Supreme Court has recognized that courts should not enforce an arbitration award that contravenes public policy. *W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber Workers,* 461 U.S. 757, 766, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983). This exception is grounded in the general rule that a court will not enforce a contract which is unlawful or in violation of public policy. *United Paperworkers Int'l Union v. Misco,* 484 U.S. 29, 42, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987). As articulated in *W.R. Grace,* the public policy must be "well defined and dominant and is to be ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.' " *W.R. Grace,* 461 U.S. at 766, 103 S.Ct. 2177 (*quoting Muschany v. United States,* 324 U.S. 49, 66, 65 S.Ct. 442, 89 L.Ed. 744 (1945)). If the contract as interpreted by the arbitrator violates some explicit public policy, then the award cannot be enforced. *Id.* Moreover, "the violation of such a policy must be clearly shown if the award is not to be enforced." *Misco,* 484 U.S. at 43, 108 S.Ct. 364; *see also Eastern Associated Coal Corp. v. United Mine Workers of America, District 17,* 531 U.S. 57, 121 S.Ct. 462, 148 L.Ed.2d 354 (2000). Of course, the burden to establish such a

1. The Commonwealth Court majority in this appeal plainly erred in its analysis when it found that judicial review under the essence test includes that for manifest unreasonableness. Majority Opinion at 861, n. 5.

violation rests with the party asserting the public policy exception.

Our Court has considered the concept of an exception to the otherwise deferential standard of review of a grievance arbitrator's award as well. Although this Court's attempts to set forth a clearly-stated exception to the essence test have been inconsistent, it is plain that in Pennsylvania, like under federal law, there are limits to the deference to be accorded a grievance arbitrator's decision.

Specifically, in *Cheyney University*, we suggested the possibility of an exception to the essence test whereby a public policy basis would lie for a court to vacate an arbitrator's award. *Cheyney University*, 743 A.2d at 416 n. 14. We found it unnecessary, however, to speak to such an exception in that appeal. Thus, we left consideration of a public policy exception to the essence test for another day.

Thereafter, the Court set forth what has been characterized as a "core functions" exception to review under the essence test. As articulated in *City of Easton*, an employer "by entering into a collective bargaining agreement could not relinquish those powers which were essential to its ability to properly discharge its various functions, including the power to terminate those employees who steal [from the employer]. . . . ." *City of Easton*, 756 A.2d at 1111. As we subsequently explained, "to permit an arbitrator to interpret the agreement as to require reinstatement of an employee who was determined to have engaged in egregious conduct that strikes at the very core function of the public enterprise would be to deprive the employer of its ability to discharge that essential function." *Greene County*, 852 A.2d at 308.

Just two years ago, however, our Court once again returned to the question of a public policy exception when we vacated an arbitration award that was deemed to be punitive in nature. Specifically, in *City of Philadelphia Office of Housing and Community Development v. American Federation of State County and Municipal Employees, Local Union No.1971*, 583 Pa. 121, 876 A.2d 375 (2005), Justice Eakin writing for our

Court deemed an arbitration award against the City of Philadelphia to be punitive in nature. Recognizing that some courts have found punitive damages to be a proper award by an arbitrator for the breach of a collective bargaining agreement, our Court determined, based on our case law, that it was against the public policy of the Commonwealth to award punitive damages against a Commonwealth agency. We noted the policy concerns that imposing punitive damages on such an entity creates a windfall to the fully-compensated plaintiff and the likelihood of an increase in taxes or a reduction in public services. While vacating an arbitrator's award of punitive damages on the basis of public policy, our Court did not set forth any general statement regarding such a public policy exception to the essence test.

The question of the proper contours of the essence test and the recognition and application of an exception to this test is once again before us. The parties' positions on this issue are straightforward; both parties agree that the essence test is to be applied in reviewing an arbitrator's award under PERA. The Association believes, however, that the core functions exception is inconsistent with the essence test; inapplicable at least in the public school context; and should be jettisoned. Conversely, the Intermediate Unit believes that the core functions exception as set forth in *City of Easton* is appropriate and should be embraced as is, and is satisfied in this case.

The core functions exception has been met with uncertainty and criticism. The Association offers an interesting argument against the exception, submitting that if an employer lacks the capacity to bargain away the ability to discharge an employee whose conduct impacts an employer from performing its core function, then this cannot be the subject of a collective bargaining agreement, and thus, implicates the initial jurisdiction of the arbitrator, ultimately leading to the conclusion that the matter is not subject to arbitration. It would appear that if this is the case, these types of disputes would then necessarily have to be resolved in our courts. Moreover, as astutely noted by Judge Pellegrini in his dissent below, there exists the distinct possibility that the core functions exception could swallow the essence test by its sheer breadth. As opined by

the dissent, "If we were to hold that conduct of this nature fell within the core functions doctrine, any unexcused absence would give an employer 'unfettered ability' to discharge an employee because when an employee is not at work, such as when a teacher is absent, it impacts the employer's ability to carry out it core functions." Dissenting Opinion at 22. Justice Saylor in his concurring opinion in *Greene County* cogently expressed similar concerns when he offered that "the core functions doctrine ... is inherently incompatible with an exclusive focus on rational derivation from the collective bargaining agreement as developed by [our] Court." *Greene County*, 852 A.2d at 310.

■■■ Considering the General Assembly's mandate of final and binding arbitration to resolve disputes under PERA and the benefits of deferential judicial review, but keeping in mind the important services entrusted to public entities, which are responsible for the health, safety, and welfare of our citizens, today we reaffirm the two-prong essence test as articulated in *Cheyney University*. We conclude, however, that the essence test should be subject to a narrow exception by which an arbitrator's award will be vacated if it is violative of the public policy of the Commonwealth. While the core functions exception as articulated in *City of Easton* attempted to set forth such a standard, we find, for the reasons stated above, the core functions exception is insufficiently precise, and raises serious questions regarding the jurisdiction to utilize arbitration as well as concerns regarding the potentially limitless reach of the exception as stated. Rather, like our adoption of the federal essence test for purposes of PERA, we conclude that the federal public policy exception is appropriately applied to arbitrator's awards arising under PERA as well. We believe that such a public policy exception constitutes a reasonable accommodation of the sometimes competing goals of dispute resolution by final and binding arbitration and protection of the public weal and is more consistent with our recent case law in this area. *Office of Housing and Community Development*. Thus, we reject the core functions exception to the essence test and supplant it with the public policy exception to the essence test.

■ More specifically, we hold that upon appropriate challenge by a party, a court should not enforce a grievance arbitration award that contravenes public policy. Such public policy, however, must be well-defined, dominant, and ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests. *Eastern Associated Coal; cf. Office of Housing and Community Development.*[2]

We now turn to application of the essence test and the public policy exception thereto, to the facts of this appeal.

As to the first prong of the essence test, we determine that the issue before the arbitrator as properly defined, i.e., whether Ms. Vrable's termination was for just cause and if not, what was to be the proper remedy, was within the terms of the collective bargaining agreement, specifically, Appendix C, Section 9(b), Collective Bargaining Agreement. Thus, the first prong of the essence test was satisfied.

■ Regarding the second prong, we conclude, contrary to the Commonwealth Court majority, that the arbitrator's interpretation which resulted in his award can rationally be derived from the collective bargaining agreement. As noted above, the arbitrator sustained the Association's grievance by finding that the Intermediate Unit lacked just cause, under Appendix C, Section 9(b), to terminate Ms. Vrable because her conduct did not rise to the level of "immorality." This conclusion was based upon the finding of a foolish mistake by Ms. Vrable in using a friend's Fentanyl patch; that this mistake did not so grossly offend the morals of the community so as to rise to the level of immorality, especially in light of it being one and only one workplace incident in Ms. Vrable's 23–year unblemished tenure with the Intermediate Unit. While the arbitrator concluded that the Intermediate Unit lacked just cause to terminate, he never suggested that the Intermediate Unit lacked

2. The Association contends that the Intermediate Unit waived a core functions exception challenge to the arbitrator's award when it failed to raise this issue before the arbitrator. As we reject the core functions test in favor of a public policy exception to the essence test and remand this matter for consideration of that exception, this waiver issue has become moot.

just cause to impose discipline of some kind—in this case a significant suspension and a last chance agreement comprised of numerous conditions for reinstatement including treatment, monitoring, and the successful completion of a probationary period. We hold that the arbitrator's award was rationally derived from the agreement, and thus, under the essence test, must be upheld.

As noted above, the essence test is highly deferential and it admonishes that courts should not become embroiled in the merits of an arbitration, but rather, must only determine if the award is indisputably and genuinely without foundation in or fails to logically flow from the collective bargaining agreement. Here, this is simply not the case. Thus, as to its application of the essence test to this matter, the decision of the Commonwealth Court to vacate the award is hereby reversed.

■ Turning to the public policy exception, we now recognize a public policy exception to the essence test that is based upon the federal public policy exception. The parties have not had the opportunity to offer specific argument as to the applicability of this exception before the courts. That being the case, and in light of our explication of this exception to the essence test, we remand this matter to the Commonwealth Court, to remand the appeal to the Court of Common Pleas of Westmoreland County, for additional proceedings consistent with our opinion today to consider whether the arbitrator's award violates the public policy of the Commonwealth. That is, to reiterate, the court should consider the issue of whether Ms. Vrable's reinstatement contravenes a well-defined, dominant public policy that is ascertained by reference to the laws and legal precedents and not from mere general considerations of supposed public interests.[3]

Jurisdiction relinquished.

Former Justice NEWMAN did not participate in the decision of this case.

---

**3.** The dissent objects to certain aspects of our decision today; however, at its core, the dissent offers yet again the repeatedly rejected "manifestly unreasonable" standard of review.

Justice BAER and Justice BALDWIN join the opinion.

Justice SAYLOR files a concurring opinion.

Justice CASTILLE files a dissenting opinion.

Justice EAKIN files a dissenting opinion.

Justice SAYLOR, concurring.

In this case, I have some difficulty with the lead Justices' decision to overrule prior decisions without reference to the

First, the dissent takes issue with what it characterizes as our *"sua sponte"* raising of the public policy exception. It is axiomatic, however, that certain questions regarding jurisprudential matters, such as the appropriate standard of judicial review, are rarely questioned by the parties, but are raised and decided by the courts themselves. Moreover, in this appeal both the Association and amicus Pennsylvania State Education Association put the exception to the essence test at issue by urging the rejection of the core functions test. These parties, however, offer no alternative standard of review. Thus, as acknowledged by the dissent, this would leave a potential void in our judicial review which this Court would be remiss not to address. For these reasons, it is entirely appropriate for our Court to consider a public policy exception to the essence test in this appeal.

Second, the dissent complains that the public policy exception is lacking in "sufficient guidance" for lower courts. This is somewhat curious, as not only is this standard sufficiently precise to be embraced by the United States Supreme Court in this same area of the law, but the identical standard has roots in our own case law. *See, Eichelman v. Nationwide Insurance Co.*, 551 Pa. 558, 711 A.2d 1006, 1008 (1998)(Castille, J.)("Public policy is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interest."); *see also Burstein v. Prudential Property & Cas. Ins. Co.*, 570 Pa. 177, 809 A.2d 204, 207 (2002). Moreover, the dissent fails to sufficiently account for our two-year old decision in *Office of Housing and Community Development*, which employs just such an exception to the essence test to vacate an arbitrator's award. Finally, the dissent's alternative of review for whether an award is "manifestly unreasonable" is a standard that has been considered and rejected numerous times. *See Cheyney University; see also Greene County; Danville Area School District; Civil Service Commission (Toth).* The reason, as explained in these cases is plain—it is inconsistent with the deferential standard of review that is the essence test. Indeed, the dissent's suggestion that manifestly unreasonable review is more limited than the public policy exception reflects a basic misunderstanding of the circumscribed nature of the public policy exception. Consistent with the statutory mandate of final and binding arbitration, the public policy exception is narrower and more defined, being firmly grounded in our Commonwealth's law, than the broader and less precise inquiry of whether an award is "manifestly unreasonable."

doctrine of *stare decisis,* requiring respect for precedent. In this regard, I agree with the United States Supreme Court's approach to matters of statutory construction, which recognizes that legislative bodies are in the best position to address judicial holdings with which they disagree, and thus, accords *stare decisis* "special force." *See Shambach v. Bickhart,* 577 Pa. 384, 406, 845 A.2d 793, 807 (2004) (Saylor, J., concurring) (quoting *Patterson v. McLean Credit Union,* 491 U.S. 164, 172–73, 109 S.Ct. 2363, 2370, 105 L.Ed.2d 132 (1989)); *cf. In re Burtt's Estate,* 353 Pa. 217, 231, 44 A.2d 670, 677 (1945) ("A statutory construction, once made and followed, should never be altered upon the changed views of new personnel of the court.").

Nevertheless, although I certainly understand the concerns that led majorities of this Court to adopt the core functions doctrine in the context of the otherwise deferential essence test, I believe that the Court has remained unsuccessful in the attempt to reconcile that doctrine with a reasoned application of the essence test. *See Greene County v. District 2, United Mine Workers of America,* 578 Pa. 347, 364–65, 852 A.2d 299, 310 (2004) (Saylor, J., concurring). Thus, I support the present holding, because I believe that the circumstances meet a narrow exception to the requirement to adhere to precedent. *See Mayhugh v. Coon,* 460 Pa. 128, 136, 331 A.2d 452, 456 (1975).[1]

Further, I have no objection to the separate adoption of a public policy exception to the essence test, in alignment with federal jurisprudence, with the understanding that the exception is exceptionally narrow, consistent with this Court's prior explanations. *See Eichelman v. Nationwide Ins. Co.,* 551 Pa. 558, 563, 711 A.2d 1006, 1008 (1998) ("As the term 'public policy' is vague, there must be found definite indications in the law of the sovereignty to justify the invalidation of [an award] as contrary to that policy . . . Only dominant public policy

1. Indeed, unlike the present lead opinion, the Court in *Greene County* did not classify the core functions doctrine as an exception to the essence test, but rather, couched the analysis in terms of whether the arbitration award rationally derived from the collective bargaining agreement. *See Greene County,* 578 Pa. at 362, 852 A.2d at 309.

would justify such action. In the absence of a plain indication of that policy through long governmental practice or statutory enactments, or of violations of obvious ethical or moral standards, the Court should not assume to declare [an award] ... contrary to public policy." (quoting *Hall v. Amica Mut. Ins. Co.*, 538 Pa. 337, 347–48, 648 A.2d 755, 760 (1994))).

Justice CASTILLE, dissenting.

I agree with the plurality opinion with respect to its affirmation of the essence test recognized in *Community College of Beaver County v. Community College of Beaver County, Society of Faculty (PSEA/NEA)*, 473 Pa. 576, 375 A.2d 1267 (1977) and reaffirmed in *State System of Higher Education (Cheyney University) v. State College University Professional Association (PSEA–NEA)*, 560 Pa. 135, 743 A.2d 405, 413 (1999). Additionally, I have no fixed opposition to the plurality's rejection of the core functions "exception" to the essence test. I do not agree, however, with the plurality's *sua sponte* invocation of a public policy exception to the essence test and I would not remand this matter for further consideration of the newly recognized exception by the Court of Common Pleas. Instead, I would find that the arbitrator's award here comported with the essence test and that the award was not manifestly unreasonable. I therefore would reverse the Commonwealth Court decision and reinstate the arbitrator's ruling. Because the plurality remands for interpretation of its new exception, I respectfully dissent.

There has been no intervening legislation since this Court's last examination of the essence test, and the parties do not advocate a public policy exception. Stepping into the void, the plurality issues a judicially-created public policy exception.[1]

1. While *Cheyney University* may have "suggested the possibility" of a public policy exception to the essence test, Op. at 663, 939 A.2d at 864, the parties were not put on notice that this matter would be the vehicle for a judicially-created rule initially mentioned in a footnote in a case almost a decade old. *See Cheyney University*, 743 A.2d at 416 n. 14. Contrary to the assertion by the plurality, Op. at 667–68 n. 3, 939 A.2d at 867 n. 3, the Court in *City of Philadelphia Office of Housing and Community Development v. AFSCME, Local Union No.1971*, 583 Pa. 121, 876 A.2d 375 (2005) never purported to adopt a public policy

The plurality's new standard not only creates an unnecessary delay in the resolution of the present matter, but does so via adopting a public policy exception in a vacuum—as the Legislature might do. The plurality's caveat that the public policy "must be well-defined, dominant, and ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests," Op. at 666, 939 A.2d at 866, does not offer the lower courts sufficient guidance. The plurality's public policy exception will only create further uncertainty and produce more litigation in a field where certainty and predictability are paramount.[2]

I realize that the plurality ventures into public policy only because of the void it creates when it "rejects the core function exception to the essence test." Op. at 665, 939 A.2d at 865. The plurality presents cogent argument in questioning the validity of that exception. I agree that our experience in this arena has made plain that there must necessarily be some limits on the power of arbitrators. It would be unreasonable to enforce an arbitral award, for example, if it contravened the law. A safety-valve is needed that will not swallow the essence test, as the core functions test had the potential to do, but instead will maintain the proper balance between arbitral deference and judicial review. Our continuing experience in this area reaffirms my long-held belief that an arbitrator's decision should be reviewed for manifest unreasonable-

exception to the essence test. Indeed, interestingly enough, Mr. Justice Saylor's Concurring Opinion in the *City of Philadelphia* case noted that in that case, as in certain other public sector labor cases, it appeared to him that the Court had effectively been applying a "manifest unreasonable" standard. *Id.* at 378-79 (Saylor, J., concurring).

2. It is true, as the plurality notes, that this Court has deemed it useful to employ a public policy standard in other areas of law, *e.g.*, review of automobile insurance policies, *see Eichelman v. Nationwide Ins. Co.*, 551 Pa. 558, 711 A.2d 1006 (1998), *Burstein v. Prudential Prop. & Cas. Ins. Co.*, 570 Pa. 177, 809 A.2d 204 (2002). Although a public policy analysis has been embraced by the U.S. Supreme Court in this area, for the reasons set forth below, I believe that a test for manifest unreasonableness is more firmly rooted in our experience.

Additionally, if application of its public policy exception is so clear and certain as the plurality asserts, perhaps it should identify the dominant policy that could remotely serve as a basis to overturn the decision here, so as to warrant the delay the remand entails.

ness as part of an application of the essence test. In my Concurring and Dissenting Opinion in *Cheyney University* I described the "manifestly unreasonable" test I would apply, as follows:

I concur in the result reached by the majority; however, I would espouse a further standard of review than that set forth by the majority. Initially, I approve of the majority's two-pronged approach and agree with the notion that the first prong should encompass the essence test. However, once a reviewing court has found, as required by the majority, that the issue before it falls within the terms of the collective bargaining agreement, then the second prong should, in my view, include further review to determine if the decision of the arbitrator is manifestly unreasonable.

Indeed, I believe that the majority alludes to this further review but fails to specifically adopt this as an appropriate approach. In its discussion of *Leechburg Area School District v. Dale*, 492 Pa. 515, 424 A.2d 1309 (1981) (*Leechburg II* ), the majority terms the holding therein as one evidencing "extreme deference" to an arbitrator's decision. The majority then correctly points out the drawbacks of an extreme deference approach by noting that "it allows an arbitration award to be upheld where the award is so without support or is so illogical, that the parties could not have possibly intended to be so bound." [*Cheyney University,* 743 A.2d] at 413. I believe that this language is, in essence, an acknowledgment that arbitration decisions are subject to judicial review where they are manifestly unreasonable. To allow review only where the arbitrator's decision cannot be rationally derived from the collective bargaining agreement is too limiting and places unbridled discretion in the hands of individual arbitrators. The majority's standard of review would allow an arbitrator's decision to stand if it could be made under the terms of the collective bargaining agreement even if the decision was manifestly unreasonable under the facts of the case. I am in accord with the majority that a straight reasonableness standard permits more judicial review than is desirable. Thus, I would have the second prong of the test include that

the arbitrator's award will be upheld if the arbitrator's interpretation can be rationally derived from the collective bargaining agreement and the decision is not manifestly unreasonable.

*Cheyney University*, 743 A.2d at 417–18 (Castille, J., concurring and dissenting). Thus, if the Court is intent on reconsidering our approach, I believe that application of the essence test should include an examination of whether the decision of the arbitrator was manifestly unreasonable.

I realize that the plurality quickly dismisses review for manifest unreasonableness, and cites *Cheyney University* to support that dismissal. Op. at 662 n. 1, 939 A.2d at 863 n. 1.[3] *Cheyney University* described the essence test as a "standard of review that has been stated using differing verbiage and that has signified various degrees of judicial deference," but declined to embrace an interpretation of the essence test which would utilize any form of reasonableness review. 743 A.2d at 412–13. However, *Cheyney University* seemed to ignore that, from its adoption, the essence test incorporated a reasonableness standard of review as one of its central features. *See Cmty. Coll. of Beaver County*, 375 A.2d at 1274; *see also Pa. Liquor Control Bd. v. Indep. State Stores Union*, 520 Pa. 266, 553 A.2d 948, 953–54 (1989) (applying a "manifestly unreasonable" standard); *County of Centre v. Musser*, 519 Pa. 380, 548 A.2d 1194 (1988) (applying a reasonableness review standard as part of the essence test); *Phila. Hous. Auth. v. Union of Sec. Officers No. 1*, 500 Pa. 213, 455 A.2d 625 (1983) (applying a "manifestly unreasonable" standard). Furthermore, it is notable that the *Cheyney University* case rightly described *Community College of Beaver County* as the "seminal case" in this area, 743 A.2d at 410, and yet failed to appreciate that, after announcing its adoption of the essence test set forth in *Ludwig Honold Mfg. Co. v. Fletcher*, 405 F.2d

---

**3.** It passes strange that the plurality deems it beyond the pale to advocate for the manifest unreasonableness standard in a case where the Court jettisons an existing standard, and *sua sponte* adopts a new one. Every case that the plurality cites which failed to approve manifest unreasonableness, of course, also failed *sub silentio* to adopt the plurality's public policy exception.

1123 (3d Cir.1969), the Court in *Community College of Beaver County* immediately noted that the essence test squared with the standard of review in existing case law, which stated that "the arbitrator's interpretation of the contract must be upheld if it is a reasonable one." 375 A.2d at 1275 (quoting *Int'l Brotherhood of Firemen & Oilers, AFL–CIO Local 1201 v. Sch. Dist. of Phila.*, 465 Pa. 356, 350 A.2d 804, 809 (1976)). Implicit in that recognition, of course, is that manifestly unreasonable interpretations need not be upheld. Although I agree that a simple reasonableness standard of review could possibly allow a court to substitute its judgment for that of the arbitrator, a "manifestly unreasonable" standard serves as an adequate check on arbitrator discretion, while preventing judicial overreaching. Indeed, if standards premised upon assessment of reasonableness truly may be deemed inadequate, as the plurality seems to believe, much of the common law would collapse.

I believe that the standard also easily accounts for our case decisions. Manifestly unreasonable review would not allow an arbitral decision to prevent a municipality from terminating the employment of an employee who steals from the municipality, as the core functions exception achieved in *City of Easton v. AFSCME, Local 447*, 562 Pa. 438, 756 A.2d 1107, 1111–12 (2000); or from terminating an employee whose repeated, serious misconduct and shortcomings threatens the safety of children, as the core functions exception also achieved in *Greene County v. District 2, United Mine Workers of America*, 578 Pa. 347, 852 A.2d 299 (2004). While taking the role and responsibility of the public employer into account, review for manifest unreasonableness, unlike the core functions exception, does not threaten to swallow the essence test. Because it is grounded in reasonableness, the test does not have the breadth of the core functions exception.

Furthermore, review for manifest unreasonableness is not as unwieldy as a public policy exception, while it can easily achieve the same desired results. For example, it would be manifestly unreasonable for an arbitral award to order a result that is unlawful. Additionally, depending on the public policy at issue, it could also be manifestly unreasonable for a

court to enforce an award that contravenes that policy. The difference is, with the manifestly unreasonable review standard, courts are not left to fashion policy as they please when a case involves an issue that lies at the fringe of some cognizable "public policy." Additionally, a public policy exception has a greater tendency to embolden a court to become a "superarbitrator," which the *Cheyney University* majority was fearful of, *see Cheyney University*, 743 A.2d at 413, than the manifestly unreasonable standard I proposed in my concurring and dissenting posture in that case. In my judgment, review for manifest unreasonableness strikes the better balance between deference and meaningful judicial review.

As the award in the matter *sub judice* (1) satisfies the essence test, and (2) is not manifestly unreasonable, I would not remand to the Court of Common Pleas for further proceedings. Instead, I would reverse and reinstate the arbitrator's decision.

Justice EAKIN, dissenting.

I join the Dissenting Opinion of Mr. Justice Castille. While I have previously recognized the precedence of the core functions exception, I too have no firm opposition to its demise. However, I cannot agree to the *sua sponte* implementation of a public policy exception which was not raised by the parties and on which we have received no advocacy on either side.