# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Cornwall-Lebanon School District    :
   :
       v.    :    No. 814 C.D. 2016
   :    ARGUED: December 12, 2016
Cornwall-Lebanon Education    :
Association,    :
       Appellant    :


BEFORE:    **HONORABLE ROBERT SIMPSON, Judge**
           **HONORABLE JOSEPH M. COSGROVE, Judge**
           **HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge**


<u>OPINION NOT REPORTED</u>


MEMORANDUM OPINION BY
SENIOR JUDGE LEADBETTER            FILED: February 3, 2017


       Cornwall-Lebanon Education Association (the Association) appeals from an order of the Court of Common Pleas of Lebanon County that (1) granted Cornwall-Lebanon School District's (the District) petition to vacate an arbitrator's award sustaining in part and denying in part the consolidated grievances of teacher Luke Scipioni (grievance sustained by arbitrator as to improper relationship with student and unlawful possession of music downloads, but denied as to lying to Superintendent about relationship and improper review and preservation of inappropriate e-mail images on a district computer); and (2) modifying the arbitrator's remedy of suspension, with a serious contingency and penalty,[1] to

---

[1] The contingency and penalty were as follows:

**(Footnote continued on next page…)**

termination of employment.  Before common pleas, the District conceded that the arbitrator's award satisfied the essence test but maintained that it should be vacated based on the Supreme Court's narrow public policy exception providing that, "a court should not enforce a grievance arbitration award that contravenes public policy." *Westmoreland Intermediate Unit #7 v. Westmoreland Intermediate Unit #7 Classroom Assistants Educ. Support Pers. Ass'n, PSEA/NEA (Westmoreland I)*, 939 A.2d 855, 863 (Pa. 2007).  In this regard, it is important to note that it is the *award* which must be found to contravene public policy, not the underlying behavior itself.  We conclude that common pleas erred in granting the District's petition to vacate the arbitration award and, accordingly, reverse.

---

**(continued…)**

> Mr. Scipioni's termination should be mitigated to a year-long suspension without pay or District contributions to any benefits for the school year 2014-2015, followed by his reinstatement for school year 2015-2016.  However, the District may at its discretion and upon written notice to the Association reinstate him at his salary for the 2013-2014 school year without increment, if any, and without a negotiated increase for the 2015-2016 year.  That is, if he is still in the "step" system, he is not to be granted credit for the year of his suspension and if he is at the top step in his education column on the guide, his percentage of dollar increase will be calculated on his 2013-2014 salary rather than the salary he would have earned had he not been suspended for the 2014-2015 year.
>
> In addition, Mr. Scipioni may be, at the District's discretion and upon written notice to him and the Association, placed on probationary status for the duration of his employment with the District.  Should he be found guilty by an independent tribunal of any further material dishonesty with the District, he may be terminated at the District's discretion.

August 16, 2015, Arbitration Award at 25-26; Reproduced Record (R.R.) 96-97a.

2

The relevant facts as found by the arbitrator are as follows.[2] The District employed Scipioni as a high school social studies teacher. During the 2003-2004 school year, he was head coach of the girls' high school basketball team. Sometime late in the season, senior "AH" related to Scipioni and the coaching staff that she had been the victim of sexual abuse. They immediately reported the matter to the authorities and the local police started an investigation that night. Although AH later repudiated her allegations, a male was removed from her home and faced criminal charges. In any event, following significant contact between AH and Scipioni and her eighteenth birthday in May 2004, their relationship culminated in a sexual encounter on graduation night in June 2004. Although they continued their relationship throughout the summer, exchanging a number of phone calls and text messages, it came to an end around the time AH reported to college in late August or early September 2004.

After the 2004 season, rumors of the relationship continued to circulate and Scipioni did not coach after that time allegedly due to family pressures. When he subsequently expressed interest in coaching again, he was told that the District did not want him to do so due to those rumors. Regarding those rumors, the high school principal credibly testified that when he questioned Scipioni about them both in 2010 and 2012, the teacher denied having an inappropriate relationship with AH. August 16, 2015, Arbitration Award at 12 and 23; Reproduced Record (R.R.) at 83a and 94a. Scipioni admitted to the principal, however, that he had gotten "too close" to AH and that it had caused him "a lot of

_____

[2] An arbitrator's "findings of fact are not reviewable on appeal, and as long as he has arguably construed or applied the collective bargaining agreement, an appellate court may not second-guess his findings of fact or interpretation." *Coatesville Area Sch. Dist. v. Coatesville Area Teachers' Ass'n, PSEA*, 978 A.2d 413, 415 n.2 (Pa. Cmwlth. 2009).

marital problems." *Id*. at 12; R.R. at 83a. Nonetheless, he continued teaching from September 2004 forward without incident.

Subsequently, when Scipioni was in protracted matrimonial litigation in the early summer of 2014, the District received an anonymous phone call from someone claiming knowledge of the 2004 relationship. The Superintendent carried out an investigation, which resulted in the District's suspension and subsequent termination of Scipioni's employment. Ultimately, the District alleged that the teacher committed five violations: (1) failing to be frank, candid, and intellectually honest and acting in an insubordinate manner; (2) being immoral by lying to the Superintendent; (3) engaging in a physical, sexual relationship with an eighteen-year old female student, beginning shortly after her graduation; (4) repeatedly and willfully failing to comply with various laws, official directives, and policies by illegally downloading and saving music onto a district computer; and (5) repeatedly and willfully failing to comply with various laws, official directives, and policies by reviewing and preserving e-mails with inappropriate and offensive photographs and captions on his work computer. *Id*. at 6-7; R.R. at 77-78a.

Following the Association's grievances on Scipioni's behalf, both of which were related to the District's alleged violation of the just cause provision of the parties' collective bargaining agreement, the matter went to arbitration with the stipulated issue of whether the District had just cause to suspend and, subsequently, to terminate Scipioni's employment and, if not, the appropriate remedy. Ultimately, the arbitrator determined that the District failed to establish just cause and that the interests of justice warranted mitigation of the District's termination of the teacher's employment.

Subsequently, the District filed a petition to vacate the arbitrator's award, arguing that it contravened public policy. Common pleas granted the petition, concluding that termination was the best option because it

> will serve to ensure that other students will not be subject to inappropriate conduct on the part of Scipioni in the future. Moreover, it is unreasonable to expect the District to subject its students to a teacher who has outright lied to both his principal and his superintendent and who has taken advantage of a District student to the extent that it not only impaired her wellbeing at the time of the affair, but also disrupted her college career and her life as a wife and mother years later. This is not the type of mentor who should be entrusted with the District's implementation of its duties to protect and serve its students.

April 21, 2016, Common Pleas' Opinion at 20. The Association's appeal to this Court followed.[3]

On appeal, the issues are as follows: (1) whether common pleas erred in vacating the arbitrator's award based on the public policy exception to the essence test; and (2) whether the court improperly modified the arbitrator's award. It is now axiomatic that "an arbitration award will be upheld if it can rationally be derived from the collective bargaining agreement, unless it contravenes public policy." *City of Bradford v. Teamsters Union No. 110*, 25 A.3d 408, 413 (Pa. Cmwlth. 2011). Our three-step analysis for application of the public policy exception provides that the court 1) identify the nature of the conduct leading to the discipline; 2) determine if that conduct implicates a well-defined and dominant public policy; and 3) determine if the arbitrator's award poses an unacceptable risk

---

[3] The determination of whether the award violated public policy is a question of law, subject to our plenary review. *Phila. Hous. Auth. v. Am. Fed'n of State, County, and Mun. Employees, Dist. Council 33, Local 934*, 52 A.3d 1117, 1121 (Pa. 2012).

5

that it will undermine the implicated policy and cause the public employer to breach its lawful obligations or public duty, given the particular circumstances at hand, including any attendant aggravating or mitigating factors, and the factual findings of the arbitrator. *Id*. at 414. Although resolution of the third step is determinative, we briefly review the first two steps to provide context for our analysis.

Pursuant to the first step, the nature of the conduct leading to the discipline primarily consists of the relationship that Scipioni had with a troubled female student in 2004, his subsequent failure to be candid with District superiors, and his review and preservation of inappropriate e-mails. Turning to the second step, the District maintained that some of the well-defined and dominant public policies implicating that conduct were the District's duty to assure that staff members were not acting inappropriately with students, duty to ensure the safety of pupils for whom it had a direct responsibility, and duty to terminate an employee who violated the duty of honesty to his employer. Assuming *arguendo* that the District met the first two steps, we conclude that common pleas erred in determining that it satisfied the third.[4]

In support of its determination that the District satisfied the third step, common pleas concluded that, taking into consideration the collective conduct of the teacher, the District proved that there was an unacceptable risk that the one-year suspension, with a contingency and penalty, would undermine the implicated policies or cause the District to breach its lawful obligations or public duty such

---

[4] As the party below asserting that the award contravened public policy, the District carried the burden of establishing that the award violated positive law. *Pa. Tpk. Comm'n v. Teamsters Local Union No. 250*, 948 A.2d 196, 207 (Pa. Cmwlth. 2008).

6

that Scipioni should not be permitted to return to a classroom. In making its determination, however, the court ignored both the factual findings and the actual violations found by the arbitrator.

Although the arbitrator concluded that the pair was involved in a physical, sexual, and romantic relationship beginning on or shortly after AH's graduation and ending in August 2004, he nonetheless sustained the grievance as to the charge of having an inappropriate relationship. In so ruling, he observed that the District did not contend that Scipioni had an improper relationship with AH before graduation and that, "the evidence that the two had significant communication and more interaction than usual between a coach or former coach and athlete while AH was still a student does not demonstrate any impropriety." August 16, 2015, Arbitration Award at 20; R.R. at 91a. Accordingly, the arbitrator concluded that Scipioni did not have culpability for whatever relationship he had with AH after graduation when she was over eighteen and no longer a student.

In contrast, common pleas reweighed the facts relating to the timing of the relationship, concluding that the "sexual/romantic relationship had its roots firmly planted during the time that AH was a District student, with plans being made to consummate that relationship as soon as she had her diploma in hand. We do not believe that public policy condones such conduct." April 21, 2016, Common Pleas' Opinion at 17. However, the arbitrator made no such finding of fact.[5] While it is true that the timing of the relationship was highly unfortunate for a lot of reasons, the arbitrator took that factor into account in rendering his

---

[5] Although the arbitrator credited testimony of AH's sister that AH wished to consummate a sexual relationship after her graduation, no evidence showed that Scipioni made such a suggestion or engaged in such planning.

7

decision. By reweighing that timing and determining that public policy justified reinstating the penalty of termination, common pleas improperly reinterpreted the arbitrator's fact-findings and substituted the court's judgment as to the appropriateness of the award. A reviewing court, however, may not second-guess an arbitrator's findings of fact or interpretation. *Coatesville Area Sch. Dist. v. Coatesville Area Teachers' Ass'n, PSEA*, 978 A.2d 413, 415 n.2 (Pa. Cmwlth. 2009). In addition, it may not review the merits or reasonableness of an award. *See Westmoreland I*, 939 A.2d at 863. Finally, the court's analysis erroneously focused on whether the conduct violated public policy rather than whether the award did so. We turn now to the teacher's failure to be honest with district officials.

The arbitrator found Scipioni's falsehoods to be "somewhat excusable and understandable," while at the same time acknowledging that the denials were self-serving. He opined as follows:

> By divulging the truth, [Scipioni] would have put AH at risk of embarrassment. It should be noted that up until this investigation, AH, who has had a troubled life, appears to have been in a stable marriage with her husband and two sons. In addition, an admission by Mr. Scipioni may have damaged his position in his divorce proceedings and jeopardized his relationship with his children, particularly the remaining minor child from his marriage. Third, divulgence would have meant that all actors in what was a tumultuous period in the life of AH, Mr. Scipioni, Ms. Hartman and others would be subject to re-opening old wounds. . . . With the exception of Mr. Scipioni—and him only to a degree—none of the actors here deserved to suffer having the zombies of their past roam mercilessly through their present . . . .

August 16, 2015, Arbitration Award at 25; R.R. at 96a. Nonetheless, the arbitrator denied the grievance as to the charge of lying, concluding that because the

8

timetable of the pair's relationship justified the suspicion that it may have been improper during AH's school days, the District had a right to question Scipioni and that, as its employee, he had a duty to be honest. *Id*. at 24; R.R. at 95a. Accordingly, taking into account the fact that the teacher owed the District a duty of honesty, the arbitrator also weighed the teacher's "otherwise good and lengthy record with the District" in determining that he should be afforded a second chance "albeit one with a serious contingency and penalty." *Id*. at 25; R.R. at 96a.

In contrast, common pleas concluded that a teacher who lied to his superiors was not the type of mentor who should be entrusted with the District's implementation of its duties to protect and serve its students and, therefore, should be subject to termination. Common pleas, however, inappropriately weighed the harshness of the award and deemed it to be too lenient for the conduct at issue. *See Westmoreland I*, 939 A.2d at 863. The arbitrator dealt with the dishonesty issue and, in so doing, weighed the reasonableness of the appropriate consequences. We turn now to the e-mail images found on Scipioni's work computer.

The arbitrator denied the grievance as to the teacher's receipt, retention, and forwarding of certain e-mail images found on his district computer, (1) rejecting his explanation as to how the images came to be there and were forwarded; and (2) concluding that he deliberately downloaded and retained them. August 16, 2015, Arbitration Award at 20; R.R. at 91a. Regarding the content of the e-mails, the arbitrator determined as follows:

> There is no question that the . . . four e-mails cited by the District are incompatible with professionalism. Some are variously scatological, misogynistic, homophobic, sexist, insensitive as to the plight of exploited children, sexually suggestive, and one— mocking poverty in a Black dialect—is racist. The vast majority of the 90 email images, however, are simply

9

examples of crude, vulgar, jejune humor, more typical of adolescents than adult professionals. Importantly, not one is pornographic.

Besides the technical fact that none of them belong on a District-owned computer, I find there are only four with content that would reasonably trouble the District.[6]

*Id.* at 19; R.R. at 90a (footnote added). Accordingly, observing that the number of e-mails was miniscule, that there was no evidence that Scipioni ever displayed them to anyone in the school community, and that none of the individuals depicted were members of that community, the arbitrator determined that they warranted a penalty short of discharge. *Id.*

Acknowledging that, standing alone, the e-mails would not justify anything more than suspension, common pleas nonetheless made a leap and concluded that, when combined with the teacher's improper relationship and dishonesty, they warranted a greater penalty. April 21, 2016, Common Pleas' Opinion at 19. In concluding that the e-mails did not form the basis for a termination case, however, the arbitrator examined the e-mails and considered the teacher's explanations regarding them. Accordingly, in reweighing the arbitrator's

---

[6] The arbitrator described the troublesome e-mails as follows:

One is a Black dialect image captioned "Why does poor People be Poor?" as though all poor people are Black. The others depict young women of likely high school age. One of those is of a girl leaning over an instructor's desk with the caption "Booty. The difference between getting an A and just barely passing." A second shows a young woman in a roadway with the caption "Play Dumb. If she looks TOO young…just assume she is 18." And the third shows what looks like a high school girl in a micro skirt in a hallway lined with lockers with the caption "Every Male Teacher That Day contemplated the consequences."

August 16, 2015, Arbitration Award at 19; R.R. at 90a.

findings and penalty for the e-mails, common pleas improperly acted as a superarbitrator.

Pursuant to our comparison of the arbitrator's fact-findings and common pleas' decision, we conclude that the court improperly reweighed the evidence and, as well, the reasonableness of the award. In so doing, it erred in determining that the District met the third step to the public policy exception to the essence test. In that regard and contrary to common pleas' implication, the arbitrator rendered an award with serious consequences for a tenured teacher.[7] Further, in mitigating the remedy of termination, the arbitrator weighed Scipioni's failure to meet his obligations to the District and his otherwise good and lengthy record with the District. In so doing, the arbitrator, *inter alia*, took into account the mitigating factor of the long and otherwise uneventful gap between the relationship and the termination, including the fact that the subsequent investigation occurred ten years after the fact and had unfortunate consequences for everyone involved.[8]

In conclusion, the parties bargained for the award and the District did not dispute that it satisfied the essence test. Keeping in mind that the public policy exception is narrow, we must agree with the Association that the arbitrator's modification of Scipioni's penalty did not contravene public policy. Accordingly, we must reverse.

**BONNIE BRIGANCE LEADBETTER,**
Senior Judge

---

[7] *See supra* note 1.

[8] The arbitrator observed that the unintended result of the investigation was to further alienate AH from her sister, disrupt AH's marriage, humiliate Scipioni before his children, and aggravate the grief of Scipioni's estranged wife over her husband's now eleven-year old infidelity. August 16, 2015, Arbitration Award at 25; R.R. at 96a.

11

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Cornwall-Lebanon School District   :
  :
         v.   :   No. 814 C.D. 2016
  :
Cornwall-Lebanon Education   :
Association,   :
         Appellant   :

# **O R D E R**

AND NOW, this 3rd day of February, 2017, the order of the Court of Common Pleas of Lebanon County is hereby REVERSED.

_____

**BONNIE BRIGANCE LEADBETTER,**
Senior Judge