IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| City of Duquesne, | : | |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | No. 567 C.D. 2020 |
| Teamsters Local Union No. 205 | : | Argued: February 9, 2021 |

BEFORE:   HONORABLE RENÉE COHN JUBELIRER, Judge
          HONORABLE PATRICIA A. McCULLOUGH, Judge (P.)
          HONORABLE CHRISTINE FIZZANO CANNON, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE FIZZANO CANNON              FILED: March 2, 2021


          The City of Duquesne (City) appeals the May 22, 2020 order of the
Court of Common Pleas of Allegheny County (trial court) that denied the City's
Petition to Vacate an arbitration award entered under the Public Employe Relations
Act (PERA),[1] which sustained a grievance filed by the Teamsters Local Union No.
205 (Union) seeking reinstatement of a terminated police secretary Union member.
Upon review, we affirm.

## I. Background and Procedure

          The basic facts underlying this matter are not in dispute.  On March 27,
2018, the City terminated the employment of 40-year clerical employee Lori

---

[1] Act of July 23, 1970, P.L. 563, *as amended*, 43 P.S. §§ 1101.101-1101.2301.

Achtzehn (Achtzehn) after a routine audit of Pennsylvania Justice Network (JNET)[2] system use conducted in March 2018 revealed that, during her time as a police secretary, Achtzehn had conducted multiple prohibited personal searches of various individuals, including herself, her relatives, and various police officers and government officials. *See* Decision of Arbitrator William J. Miller dated June 25, 2019 (Arbitration Award) at 2 & 6-7; Trial Court's Pennsylvania Rule of Appellate Procedure 1925(a) Opinion dated August 7, 2020 (Trial Court Opinion) at 2. The Union filed a grievance on Achtzehn's behalf claiming that the City lacked just cause for the termination, and the matter proceeded to arbitration. *See* Arbitration Award at 1; Trial Court Opinion at 2.

On February 29, 2019, a hearing on the grievance was held before William J. Miller, Jr. (Arbitrator), at which both the City and Achtzehn were represented by counsel and presented evidence. *See* Arbitration Award at 1; Trial Court Opinion at 2. Sergeant Renjienico Manday, the City's JNET sponsor, testified and explained that the primary rule of JNET use is that the system is not to be used for personal, non-criminal justice or non-governmental purposes. *See* Arbitration Award at 1. Sergeant Manday testified that, through JNET, Achtzehn had access to both individuals' Pennsylvania Department of Transportation (DOT) information and criminal history records, although Sergeant Manday noted that Achtzehn never accessed any individual's criminal history. *See id.* at 1-2. Sergeant Manday testified

---

[2] JNET is an online law enforcement database that contains both individuals' criminal history and Pennsylvania Department of Transportation (DOT) information and which law enforcement officials regularly use as an investigative tool and to otherwise conduct the business of law enforcement within the Commonwealth. The trial court explained that "JNET is to be used for law enforcement purposes only. Personal use of JNET is explicitly prohibited." Trial Court Opinion at 2. Further, as the trial court observed, "[t]he [JNET] login screen warns users that any misuse could lead to criminal prosecution." *Id.*

that Achtzehn had conducted numerous personal non-criminal JNET searches, including searches of herself, her relatives, police officers, and government officials, which searches represented violations of the prohibition against personal JNET use. *See id.* at 2 & 7. Sergeant Manday explained that he investigated each instance of alleged improper personal JNET use and interviewed Achtzehn about the same. *See id.* at 2.

Achtzehn also testified before the Arbitrator and admitted to making the JNET searches uncovered by Sergeant Manday's audit.[3] *See* Arbitration Award at 7. Achtzehn contended, however, that she performed the allegedly improper JNET search, or "lookups," for legitimate business purposes. *See id.* at 3-4 & 7. Achtzehn explained that some of the JNET lookups involved computer problems, and that the JNET lookups were performed in an effort to determine whether the problems were caused by computer issues or issues with JNET. *See id.* at 3. She explained that, when conducting JNET lookups for these purposes, she used her own name, or the names of relatives, to avoid violations of employing JNET for non-governmental purposes. *See id.* at 3. Achtzehn explained her lookups of City officials resulted from other, legitimate purposes, such as getting the address of the incoming mayor, whose address would be needed in any event, or confirming the addresses of individuals subject to the City's employment residency requirements. *See id.* at 3. Achtzehn also explained that, following her discussions with Sergeant Manday regarding the instances of her alleged improper instances of JNET use, she further researched certain JNET lookups and attempted to supplement their

---

[3] Achtzehn also admitted that she saw the JNET warning screen that states that personal use of JNET is prohibited and could result in criminal prosecution each time she logged into the system. *See* Arbitration Award at 6-7.

discussions with additional information about those items, but that Sergeant Manday would not accept such supplemental information. *See id.* at 3.

Additionally, documentation submitted at the arbitration hearing illustrated that, as a result of Sergeant Manday's investigative report on Achtzehn's JNET use, the JNET Security Administrator informed the City's police chief that Achtzehn's JNET use violated JNET's and DOT's proper use policies. *See* Arbitration Award at 3 & 7. The documentation revealed that, as a consequence of the allegedly improper use, the JNET Security Administrator recommended that the City suspend Achtzehn's JNET access for a period of 60 days, and her access to DOT's system for 90 days. *See id.* at 7.

Based on this evidence, the Arbitrator found that the City lacked just cause to terminate Achtzehn's employment. *See* Arbitration Award at 9; *see also* Trial Court Opinion at 3. While the Arbitrator found that Achtzehn had engaged in the conduct asserted by the City, and that such conduct was improper, the Arbitrator found that no evidence existed that showed that Achtzehn was on notice that personal JNET use could result in discipline or the termination of her employment. *See* Arbitration Award at 7-8; *see also* Trial Court Opinion at 3. Additionally, the Arbitrator determined that Achtzehn was denied a full and fair investigation into the alleged violations because she had not been allowed to respond appropriately to each individual incident of improper JNET use before the report of such violations was submitted to the JNET system administrators. *See* Arbitration Award at 7-8; *see also* Trial Court Opinion at 3. Ultimately, the Arbitrator granted the grievance and returned Achtzehn to work with full back pay. *See* Arbitration Award at 9.

The City filed a Petition to Vacate Arbitration Award (Petition to Vacate) in the trial court on July 25, 2019, alleging that the Arbitration Award did

4

not represent a rational interpretation of the parties' collective bargaining agreement[4] (CBA) and further that the Arbitration Award violated public policy. *See* Petition to Vacate, Reproduced Record (R.R.) at 3a-31a. The trial court denied the Petition to Vacate on May 22, 2020. *See* Order of Court dated May 22, 2020 (Trial Court Order); Reproduced Record (R.R.) at 85a. The City appealed the Trial Court Order to this Court.

In the Trial Court Opinion, the trial court explained that the Arbitration Award in this matter satisfied the essence test in that the issue presented – termination for just cause – was within the terms of the CBA, and also that the Arbitrator's award flowed logically from the CBA. *See* Trial Court Opinion at 4-6. Additionally, the trial court further explained that the Arbitration Award did not violate a well-defined, dominant public policy. *See id.* at 6-7.

## II. Claims

On appeal, the City claims that the trial court erred by denying the Petition to Vacate. Specifically, the City alleges that the Arbitration Award cannot be rationally derived from the CBA because it imposes a requirement on the City that does not appear in the CBA: a requirement that the City inform employees that JNET misuse could result in disciplinary action. *See* City's Brief at 4, 8 & 10-12. The City further claims that the trial court erred by denying the Petition to Vacate because the Arbitration Award violates a well-defined, dominant public policy against unauthorized access to individuals' personally identifiable information. *See id.* at 4, 8-9 & 13-17.

---

[4] The City and the Union are party to a collective bargaining agreement (CBA) effective January 1, 2015, through December 31, 2019, that governs the terms of employment between the City and the Union's members. *See generally* CBA; Reproduced Record (R.R.) at 13a-30a; *see also* Trial Court Opinion at 1.

5

## III. Discussion

## A. The Essence Test Claim

Appellate review of a grievance arbitration award is generally conducted pursuant to the two-part "essence test." *Sch. Dist. of Phila. v. Phila. Fed'n of Teachers*, 164 A.3d 546, 552 (Pa. Cmwlth. 2017). Under the essence test,

> [f]irst, the court shall determine if the issue as properly defined is within the terms of the collective bargaining agreement. Second, if the issue is embraced by the agreement, and thus, appropriately before the arbitrator, the arbitrator's award will be upheld if the arbitrator's interpretation can rationally be derived from the collective bargaining agreement. That is to say, a court will only vacate an arbitrator's award where the award indisputably and genuinely is without foundation in, or fails to logically flow from, the collective bargaining agreement.

*State Sys. of Higher Educ. (Cheyney Univ.) v. State Coll. Univ. Pro. Ass'n (PSEA-NEA)*, 743 A.2d 405, 413 (Pa. 1999); *see also Westmoreland Intermediate Unit # 7 v. Westmoreland Intermediate Unit # 7 Classroom Assistants Educ. Support Pers. Ass'n, PSEA/NEA*, 939 A.2d 855, 863 (Pa. 2007). Thus, "[a]n arbitrator's award must be sustained 'if it is based on anything that can be gleaned as the 'essence' of the [collective bargaining agreement].'" *Pa. State Sys. of Higher Educ. v. Ass'n of Pa. State Coll. & Univ. Faculties*, 98 A.3d 5, 14 (Pa. Cmwlth. 2014) (quoting *Am. Fed'n of State, Cnty. & Mun. Emps., Dist. Council 84, AFL–CIO v. City of Beaver Falls*, 459 A.2d 863, 865 (Pa. Cmwlth. 1983)). Further, "[t]he essence test does not permit this Court to vacate an arbitrator's award even if we disagree with the arbitrator's interpretation of the [collective bargaining agreement]." *Am. Fed'n of State, Cnty., & Mun. Emps., Dist. Council 87 v. Cnty. of Lackawanna*, 102 A.3d 1285, 1290 (Pa. Cmwlth. 2014) (citing *Cent. Susquehanna Intermediate Unit Educ.*

6

*Ass'n v. Cent. Susquehanna Intermediate Unit # 16*, 459 A.2d 889, 890 (Pa. Cmwlth. 1983)). "The essence test is an exceptionally deferential standard, because binding arbitration is a highly favored method of dispute resolution." *Dep't of Corr., State Corr. Inst. at Forest v. Pa. State Corr. Officers Ass'n*, 173 A.3d 854, 858 (Pa. Cmwlth. 2017) (citing *Northumberland Cnty. Comm'rs v. Am. Fed'n of State, Cnty. & Mun. Emps., AFL–CIO Local 2016, Council 86*, 71 A.3d 367, 374 (Pa. Cmwlth. 2013)). The party challenging an arbitration award bears the "burden of proving the award does not draw its essence from the [collective bargaining agreement]." *See Pa. State Sys. of Higher Educ.*, 98 A.3d at 14.

The City contends that the trial court erred and should be reversed because the Arbitration Award fails to satisfy the essence test. *See* City's Brief at 4, 8 & 10-12. Neither party argues that the first prong of the essence test is not met; both parties agree that Article 11 of the CBA covers the termination of Union members by the City and allows an arbitrator to reinstate and compensate an employee who the City unjustly terminated. Therefore, we proceed directly to the second prong of the essence test – the question of whether the Arbitration Award can be rationally derived from the CBA.

The City alleges the Arbitration Award is not rationally derived from the CBA in that it imposes an additional requirement on the City to inform employees that JNET misuse could result in disciplinary action, which requirement does not appear in the CBA. *See* City's Brief at 4, 8 & 10-12. We disagree.

Our Supreme Court has explained the following:

> Under the second prong [of the essence test], we ask whether the award itself can rationally be derived from the [collective bargaining agreement]. Here, again, we emphasize that the parties to a [collective bargaining agreement] have agreed to allow the arbitrator to give

7

meaning to their agreement and fashion appropriate remedies for unforeseeable contingencies. The words of the [collective bargaining agreement] are not the exclusive source of rights and duties. The arbitrator is authorized to make findings of fact to inform his interpretation of the [collective bargaining agreement].

Accordingly, even though an arbitrator is not permitted to ignore the [collective bargaining agreement's] plain language in fashioning an award, the arbitrator's understanding of the plain language must prevail. A reviewing court should not reject an award on the ground that the arbitrator misread the contract. The law is clear that an arbitrator's award must draw its essence from the [collective bargaining agreement]. It need not [] reflect the narrowest possible reading of the [collective bargaining agreement's] plain language. Even if a court's interpretation of the [collective bargaining agreement] is entirely different than the arbitrator's, the award must be upheld so long as it rationally derives from the [collective bargaining agreement].

*Millcreek Twp. Sch. Dist. v. Millcreek Twp. Educ. Support Pers. Ass'n*, 210 A.3d 993, 1006 (Pa. 2019) (internal quotation marks and citations omitted).

Here, Article 11, Section 1 of the CBA states that "[t]he Employer shall not discharge nor suspend any employee without just cause." CBA at 7; R.R. at 21a. The CBA does not, however, define the term "just cause." Our Supreme Court has noted that "[b]ecause the concept of just cause, as generally understood,[5] may be

---

[5] Our Supreme Court has observed that

as a general proposition, the concept of just cause as it is used in labor relations, is not capable of easy and concrete definition. A just cause provision, in its most basic terms, is a negotiated form of limited job security that to a degree restricts the employer's otherwise unfettered right to discharge and discipline employees. Although there is no exact definition, there is a general consensus as

8

more than a simple determination of whether the employee engaged in the misconduct, it [is] for [an] arbitrator to interpret the terms of the collective bargaining agreement and not the courts." *Off. of Att'y Gen. v. Council 13, Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO*, 844 A.2d 1217, 1225 (Pa. 2004). Therefore, by virtue of his role of resolving disputes arising under the CBA,[6] it was for the Arbitrator to interpret whether there was just cause for discharge in this particular case. *See id.* at 1224.

Here, the Arbitrator found that the City lacked just cause to terminate Achtzehn where the evidence did not illustrate that the City ever warned Achtzehn that improper use of the JNET system could result in disciplinary action. *See* Arbitration Award at 7-8. Additionally, the Arbitrator noted that Achtzehn received no discipline prior to the termination at issue in this matter over Achtzehn's 40 years of employment with the City. *See id.* at 6. The Arbitrator also recognized that the former Chiefs of Police of the City under whom she served for 40 years had condoned Achtzehn's prior similar use of the JNET system. *See id.* at 8. Further,

---

to some of the factors that may be considered in determining whether there is just cause for discharge or discipline, and in evaluating the penalty imposed. Arbitrators have considered such factors as, *inter alia,* whether there was any investigation; post-discharge misconduct and pre-discharge misconduct; a grievant's past employment record, length of service, post-discharge rehabilitation; and unequal treatment of other employees for similar misconduct.

*Off. of Att'y Gen. v. Council 13, Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO*, 844 A.2d 1217, 1224–25 (Pa. 2004) (footnotes omitted).

[6] Article 10, Section 2 of the CBA outlines the City and the Union's agreed-upon grievance procedure and provides that, if the parties cannot arrive at an agreement on disputes by lesser means outlined by the CBA, then grievances will proceed to binding arbitration. *See* CBA at 6-7; R.R. 20a-21a.

9

the Arbitrator observed that, although she was given the opportunity to respond to the allegations of improper JNET use, Achtzehn was not thereafter allowed to supplement her explanations or provide the additional information she wished to proffer regarding the incidents. *See id.* at 7-8. The Arbitrator's consideration of these mitigating circumstances in interpreting the undefined just cause provision of the CBA was entirely rational. *See Off. of the Att'y Gen.*, 844 A.2d at 1225 (noting that it was entirely rational for an arbitrator to interpret the undefined just cause provision of a collective bargaining agreement as permitting consideration of mitigating circumstances in determining whether an employee was discharged for just cause). Therefore, the Arbitrator properly considered the lack of prior discipline of Achtzehn, the lack of the City's prior warnings, the prior conduct of her superiors, and Achtzehn's inability to supplement her responses to the allegations as mitigating circumstances when determining whether Achtzehn's JNET lookups represented just cause under the CBA justifying the penalty of termination imposed by the City. Accordingly, the Arbitration Award's determination that the City lacked just cause in terminating Achtzehn rationally derives from the CBA and satisfies the essence test. We find no error in the trial court's denial of the Petition to Vacate on this ground. *See* Trial Court Opinion at 6.

## B. The Public Policy Claim

In its second claim, the City argues that the trial court erred by denying the Petition to Vacate because the Arbitration Award violates a well-defined, dominant public policy against unauthorized access to individuals' personally identifiable information. *See id.* at 4, 8-9 & 13-17. We disagree.

Even where an arbitration award satisfies the essence test, our Supreme Court has delineated a discrete exception whereby a reviewing court may still vacate

the award if it violates public policy. *See Millcreek Twp. Sch. Dist.*, 210 A.3d at 1007-11; *see also Westmoreland*, 939 A.2d at 865-66. The application of this public policy exception requires that "[s]uch public policy . . . must be well-defined, dominant, and ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." *Westmoreland*, 939 A.2d at 866. Unlike the deferential standard of review employed to review determinations under the essence test, appellate review of the public policy exception "lies in the proper application of the public policy exception to the essence test. This is a pure question of law; [the] standard of review is *de novo,* and [the] scope of review is plenary." *Phila. Hous. Auth. v. Am. Fed'n of State, Cnty. & Mun. Emps., Dist. Council 33, Local 934*, 52 A.3d 1117, 1121 (Pa. 2012). Further, our Supreme Court has expressly recognized that

> not only is the public policy exception "exceptionally narrow" in its own right, but it is also an exception to the essence test, which is itself a narrow exception to the doctrine that arbitration awards are final and binding. A baseline recognition that the public policy exception is a narrow exception to a narrow exception must guide a reviewing court's analysis.

*Millcreek Twp. Sch. Dist.*, 210 A.3d at 1011 (internal citations omitted).

The Supreme Court has articulated a three-part test to determine the appropriate application of the public policy exception to the essence test. *See Millcreek Twp. Sch. Dist.*, 210 A.3d at 1011.

> First, a reviewing court must identify precisely what remedy the arbitrator imposed. Next, the court must inquire into whether that remedy implicates a public policy that is well-defined, dominant, and ascertained by reference to the laws and legal precedents and not from

11

> general considerations of supposed public interests. Finally, the reviewing court must determine if the arbitrator's award compels the employer to violate the implicated policy, given the particular circumstances and the factual findings of the arbitrator.

*Id.* (emphasis, internal citations, and internal quotation marks omitted). The Supreme Court further emphasized that "the arbitrator's interpretation of the contract controls during this entire analysis, which is only triggered upon the reviewing court's determination that the award satisfies the essence test, and should be upheld absent a clear violation of public policy." *Id.* Moreover, "[t]he burden is on the party that opposes the award to demonstrate that it violates public policy." *Id.*

To make the determination of whether the public policy exception to the essence test applies to this matter, we review the facts of the case pursuant to the three-part *Millcreek* test.

1. *The precise remedy imposed by the Arbitrator.*

The precise remedy imposed by the Arbitrator for consideration in this matter was reinstating Achtzehn to work with full back pay. *See* Arbitration Award at 9.

2. *Whether the remedy implicates a well-defined, dominant public policy.*

Next, as the party that opposed the Arbitration Award, the City bears the burden of demonstrating that the Arbitration Award remedy implicates public policy. *See Millcreek Twp. Sch. Dist.*, 210 A.3d at 1011. As stated *supra*, in order for the public policy exception to the essence test to apply, the alleged public policy involved "must be well-defined, dominant, and ascertained by reference to the laws

12

and legal precedents and not from general considerations of supposed public interests." *Westmoreland*, 939 A.2d at 866.

The City alleges that a well-defined public policy against the unauthorized access to personally identifiable information exists and applies to this matter. *See* City's Brief at 13-17. To sustain its burden of establishing the existence of this policy, the City directs the Court's attention to our Supreme Court's decision in *Pennsylvania State Education Association v. Department of Community and Economic Development*, 148 A.3d 142 (Pa. 2016), which acknowledged that Article I, Section 1 of the Pennsylvania Constitution guarantees a right of informational privacy, which the Court noted consists of "the right of the individual to control access to, or the dissemination of, personal information about himself or herself." *Id.* at 151-58. As further support of the existence of a well-defined, dominant public policy against unauthorized access to personally identifiable information, the City also notes multiple federal and state statutes that restrict and protect access to personal information.[7] *See* City's Brief at 14-15. Effectively, the City argues that the Supreme Court's acknowledgement of a right of informational privacy, together with the existence of statutes designed to protect personally identifiable information, evidences a well-defined, dominant public

---

[7] The City identifies the following federal statutes as evidencing a well-defined, dominant public policy against the unauthorized access of personally identifiable information: (1) the federal Privacy Act of 1974, Act of December, 31, 1974, P.L. 93–579 § 2, Title V, § 552a note, 88 Stat. 1897, 5 U.S.C. § 552a, passed in response to concerns regarding government misuse of personal information; (2) the Gramm-Leach-Bliley Act, 15 U.S.C. § 6801, which protects individuals' personal financial information; (3) the Children's Online Privacy Protection Act, 15 U.S.C. §§ 6501-06, which seeks to prevent the personal information of children by online websites; (4) the Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, 110 Stat. 1936 (codified as amended in scattered sections of 18, 26, 29, and 42 U.S.C.); and (5) the federal Family Educational and Privacy Rights Act, 20 U.S.C. § 1232g. *See* City's Brief at 14. Additionally, the City identifies the Pennsylvania Right-to-Know Law, Act of February 14, 2008, P.L. 6, 65 P.S. § 67.708(b)(6)(i), as supportive of the existence of a well-defined, dominant public policy against the unauthorized access of personally identifiable information. *See id.* at 14-15.

13

policy against the disclosure of such information. *See id.* at 13-15. The City further alleges this policy is reflected in JNET's privacy policy, which seeks to ensure the JNET system employs and observes safeguards and sanctions designed to protect individual privacy, among other protected interests. *See id.* at 15-16.

The trial court did not agree, and noted instead that

> [t]he City has failed to meet its burden [to illustrate the existence of a well-defined, dominant public policy]. Specifically, it failed to show how the Arbitrat[ion] Award implicates a public policy that is well-defined, dominant, and ascertained by reference to the laws and legal precedents. [The City] failed to explore the rationale behind the JNET policy with broader public concerns regarding the right to privacy. Without more, [the City] has failed to demonstrate how the [Arbitration] Award compels it to violate a public policy.

Trial Court Opinion at 7. As a result of its determination, the trial court concluded that,

> [g]iven the particular circumstances and the factual findings in this matter, no broader privacy concerns were implicated by [the City]. Instead, the City asserts only general considerations of supposed public interests. Therefore, the narrow public policy exception to the essence test does not apply to this matter.

*Id.*

We do not agree with the trial court's conclusion. While the City's anecdotal references to various statutes that touch on privacy concerns surrounding individuals' personal information may not, on their own, adequately evidence the existence of a well-defined, dominant public policy against the dissemination of personally identifiable information, our Supreme Court's acknowledgement of a

14

right of informational privacy does adequately evidence such a public policy. *See Pa. State Educ. Ass'n*, 148 A.3d at 151. Additionally, while it argues that the facts of this matter do not represent a violation of this implicated policy, the Union does not argue that a public policy against the unauthorized access of personally identifiable information does not exist, *see* Union's Brief at 17-19, and we have little trouble agreeing that such a well-defined, dominant public policy exists in Pennsylvania.

3. *Whether the Arbitration Award compels violation of a well-defined, dominant public policy.*

Although a well-defined, dominant public policy against the unauthorized access of personally identifiable information exists, the Arbitration Award in this case does not violate such a policy. An arbitrator's award will be found in violation of a stated public policy where it makes a mockery of, or causes an employer to violate, an implicated public policy. *See Phila. Hous. Auth.*, 52 A.3d at 1125 (finding absurd and a mockery of the dominant public policy against sexual harassment an award that reinstated, with full back pay, an individual whose egregious conduct amounted to sexual harassment). The award in this matter does neither.

As this Court has explained:

> [C]ourts are to give arbitration awards deference and are not to second-guess an arbitrator's findings of fact or interpretations. But these awards are not entitled to a level of devotion that makes a mockery of the dominant public policy . . . .

15

*Neshaminy Sch. Dist. v. Neshaminy Fed'n of Teachers*, 171 A.3d 334, 340 (Pa. Cmwlth. 2017) (internal citations and quotation marks omitted). In evaluating whether an arbitration award violates a dominant public policy, reviewing courts consider "both aggravating and mitigating factors in determining whether an award poses an unacceptable risk that a clear public policy will be undermined if the award is implemented." *Id.* (internal quotation marks and brackets omitted); *see also Pa. State Sys. of Higher Educ., Lock Haven Univ. v. Ass'n of Pa. State Coll. & Univ. Faculties*, 193 A.3d 486, 500 (Pa. Cmwlth. 2018) (same). For example, courts have vacated arbitration awards pursuant to the public policy exception where, despite proven explicit and continuous conduct amounting to sexual harassment in contravention of Pennsylvania's public policy against such harassment, arbitration remedies imposed very little punishment. *See Neshaminy Sch. Dist.*, 171 A.3d at 343 (20-day suspension with back pay violated public policy against sexual harassment); *see also Phila. Hous. Auth.*, 52 A.3d at 1128 (award granting immediate reinstatement with back pay in the face of "egregious" conduct amounting to sexual harassment makes a mockery of public policy against sexual harassment). Given the specific facts and mitigating circumstances of the instant matter, the Arbitration Award does not make a mockery of the dominant public policy against the unauthorized access of personally identifiable information.

The Arbitrator herein reinstated Achtzehn with full back pay. *See* Arbitration Award at 9. In fashioning this remedy, the Arbitrator noted that, while the evidence established that Achtzehn clearly knew that she should not access JNET for personal reasons, no evidence illustrated that she had been warned that such access would result in disciplinary actions against her. *See* Arbitration Award at 7. Further, the Arbitrator noted that the evidence revealed that Achtzehn had previously

16

performed JNET lookups of the kind for which she was disciplined in this matter with the permission and approval of prior City Chiefs of Police. *See id.* at 8. Additionally, the Arbitrator observed that Achtzehn testified that she had conducted the lookups sparingly and for business reasons and that, further, she had not been afforded a full and fair opportunity to explain her actions prior to being disciplined. *See id.* at 7-8. Under these circumstances, the Arbitrator's decision to reinstate Achtzehn with back pay does not make a mockery of the public policy against unauthorized access of personally identifiable information, nor does it require the City to violate the same. Accordingly, the public policy exception to the essence test does not apply to this matter.

For the above reasons, we affirm the Trial Court Order denying the Petition to Vacate.

_____
CHRISTINE FIZZANO CANNON, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

City of Duquesne,                    :
           Appellant         :
                           :
      v.                   :
                           :  No. 567 C.D. 2020
Teamsters Local Union No. 205   :

O R D E R

AND NOW, this 2nd day of March, 2021, the May 22, 2020 order of the Court of Common Pleas of Allegheny County is AFFIRMED.

_____
CHRISTINE FIZZANO CANNON, Judge