IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Riverview Intermediate Unit #6 | : | |
| | : | No. 1134 C.D. 2020 |
| v. | : | |
| | : | Argued: May 10, 2021 |
| Riverview Intermediate Unit #6 | : | |
| Education Association, | : | |
| Appellant | : | |

BEFORE:   HONORABLE PATRICIA A. McCULLOUGH, Judge
HONORABLE CHRISTINE FIZZANO CANNON, Judge
HONORABLE J. ANDREW CROMPTON, Judge

## *OPINION NOT REPORTED*

MEMORANDUM OPINION
BY JUDGE McCULLOUGH                                    FILED: June 7, 2021

Riverview Intermediate Unit #6 Education Association (Association) appeals from the September 25, 2020 order entered by Court of Common Pleas of Clarion County (trial court), which granted Riverview Intermediate Unit #6's (Unit) petition to vacate a labor arbitration award (Award). On appeal, the Association argues that the trial court departed from the limited, deferential review of arbitration awards, and erroneously vacated the Award. For the reasons that follow, we find that the trial court erred in granting the Unit's petition, reverse the trial court's order, and remand for entry of an order denying the Unit's statutory appeal.

**Factual and Procedural Background**

The relevant facts as found by the arbitrator are as follows.[1] The Unit provides special educational services to students in multiple Pennsylvania school districts in four counties. The Association is the collective bargaining agent representing certified educational support personnel who are assigned to assist teaching professionals in various separate school districts within the four counties in which the Unit provides services. The parties entered into a Collective Bargaining Agreement (CBA), which became effective on July 1, 2015, and continued in effect through June 30, 2020.

From time to time, it is necessary for the Unit to "realign" its professional staff where the needs of the specific classroom are eliminated due to changes in student population. The parties addressed the change of working conditions due to involuntary realignment in the CBA, Article X (Vacancies, Transfers and Assignments), Section B.3 (Transfers and Assignments), which provides, in relevant part:

> If an employee is involuntarily transferred (X.B.1) or realigned (X.B.3), and if the new assignment is more than twenty (20) miles, round trip, from the previous assignment, the base for calculating mileage shall remain the same for one (1) year.

(Reproduced Record (R.R.) at 21a-22a.)

At the end of the 2017-18 school year, Grievant Donna Foster, a bargaining unit member, was involuntarily realigned and her new assignment, Cranberry High School, was more than 20 miles roundtrip from her previous assignment, Pleasantville Elementary in Titusville. Ms. Foster's new assignment was

---

[1] "Under the essence test, the arbitrator's findings of fact are binding on the courts, and the reviewing court may not undertake any independent factual analysis." *Pennsylvania State System of Higher Education, Lock Haven University v. Association of Pennsylvania State College & University Faculties*, 193 A.3d 486, 495 (Pa. Cmwlth. 2018).

2

closer to her home. Pursuant to Article X, Section B.3 of the CBA, Ms. Foster requested mileage compensation for the distance between her old and new assignments for every day she worked during the 2018-19 school year. The Unit denied her request because the new assignment was closer to Ms. Foster's residential home and her commute to work was shorter. Three other involuntarily realigned bargaining unit members, Sarah Johnson, Sarah Kasanicky, and Amber Villar, requested mileage compensation for the 2018-19 school year under this same provision. Like Ms. Foster, their new assignments were more than 20 miles roundtrip from their previous assignments. Their requests for mileage compensation under Article X, Section B.3 of the CBA were denied by the Unit for the same reason, *i.e.*, their new assignments were closer to their respective homes, resulting in shorter commutes to work.

On January 25, 2019, the Association filed a group grievance on behalf of Ms. Foster and the other affected employees (collectively, "Grievants"), alleging that the Unit arbitrarily denied them mileage compensation under Article X, Section B.3. The Unit denied the group grievance on the grounds that the displaced employees were driving less distance from their homes to their new assignment and Article X, Section B.3 was not intended to pay realigned employees for mileage not traveled.

After exhausting the steps of the arbitration process under the CBA, the parties proceeded to binding arbitration and selected an arbitrator to hear the case. A hearing was held before the arbitrator on October 11, 2019. Andrew Lugg, local President of the Association, testified on behalf of the Association, as did Grievants. The Unit's Director, Michael Stahlman, testified on behalf of the Unit.

Before the arbitrator, the Unit relied heavily on a decision issued in 2007 by another arbitrator, Richard Dissen, (the 2007 Arbitration Case), involving the Unit

3

and the Association and the same provisions of the CBA.[2]  In the Unit's view, the 2007 Arbitration Case was "law of the case" and supported its position that mileage reimbursement is not available under Article X, Section B.3 in situations where the employee's commute from home to his/her new assignment is less than it was prior to the involuntary realignment.

## The 2007 Arbitration Case

In the 2007 Arbitration Case, the grievant was realigned and had to commute a longer distance from his home to his new assignment.  He sought mileage reimbursement under Article X, Section B.3 for each day he was required to travel *from his home* to his new assignment.  His request was denied by the Unit.  The parties proceeded to arbitration and the grievance was assigned to Arbitrator Richard Dissen. The issue before Arbitrator Dissen was whether there were any provisions in the CBA that would limit the availability of a reimbursement under Article X, Section B.3.  The Unit argued that another provision of the CBA, specifically Article XII, Section B (Travel Reimbursement),[3] limited the amount of reimbursement for travel to those

---

[2] The 2007 Arbitration Case appears at pages 86a-102a of the Reproduced Record.

[3] Reimbursement to itinerant (*i.e.*, traveling) employees for work-related travel is addressed in Article XII, Section B of the CBA, which provides:

> B.    Each itinerant employee will have a designated base employment location. *The IU [Unit] will reimburse employees at the prevailing IRS [Internal Revenue Service] rate for mileage from the base location to and between all other work locations and back to the base location*.  When an employee reports to their base, mileage accumulates from the base to the various assignments and back to the base provided the employee returns to the base. *When the employee does not report to base but to an alternative location, and does not return to base, mileage will be allowed in total miles traveled less miles from home to base and base back home.  At no time is an employee reimbursed for mileage between home and base.*  Mileage reimbursement for traveling to conferences will be reimbursed from home to home.

(R.R. at 26a) (emphasis added).

4

amounts that are deductible under IRS regulations. The Unit argued that mileage charges incurred by employees to travel from their homes to the primary workplace are not deductible expenses. It thus follows, argued the Unit, that because the grievant sought reimbursement for roundtrip mileage from his home to base, he was not entitled to the benefit under Article X, Section B.3. Arbitrator Dissen rejected the Unit's argument, concluding that Article XII did not express such limitation. Although recognizing Article XII prohibited reimbursement for mileage between home and base, Arbitrator Dissen nevertheless gave effect to Article X, Section B.3, explaining that the distance between the two assignments must be computed, *less* the miles driven from the employee's home to the new assignment. Arbitrator Dissen went on to state, however, that *if* the grievant *had been* involuntarily realigned to a school which was *closer* to his home, then the Unit could have reasonably asserted that the grievant should not be awarded mileage reimbursement under Article X, Section B.3.

### Arbitrator's Award

In this case, based upon the evidence presented and the parties' post-hearing briefs, the arbitrator issued the Award on February 11, 2020. The arbitrator framed the issue as follows:

> Did Riverview Intermediate Unit No. 6 arbitrarily deny the mileage compensation to [Grievants], as required by Article X, Section B.3 of the [CBA], when [Grievants were] realigned at the end of the 2017-18 School Year and [their] new assignment[s were] more than twenty (20) miles roundtrip from [their] previous assignment[s], but the new assignment[s] actually involved a shorter driving distance from the employee[s'] home than was required prior to the reassignment?

(Award at 8.)

5

Interpretating the CBA, the arbitrator found that Article X, Section B.3 clearly grants a "contract benefit," which he described as a "displacement mileage benefit." *Id.* at 19, 22. The arbitrator found that the displacement mileage benefit provided under Article X, Section B.3 "clearly requires two eligibility requirements, namely, an involuntary transfer as defined under Article X, Section B.1 or as in this case, an involuntary <u>realignment</u>, under its Section B.[3], and a new work assignment to be greater than 20 miles, roundtrip, from the previous assignment." *Id.* at 14 (emphasis in original).

The arbitrator found that the Article X, Section B.3 "displacement mileage benefit" was first introduced into the CBA in 1997 and was "intended to ***defray the costs incurred by the employees who are realigned to work at a different site.***" *Id.* (emphasis in original).

The arbitrator rejected the Unit's suggestion that the distance between an employee's home to his/her new work assignment is relevant to the computation of the displacement mileage benefit under Article X, Section B.3. In other words, the fact that an employee's home may be located closer to his/her new assignment is not a factor to consider under Article X, Section B.3. The arbitrator found that Article X, Section B.3 has nothing whatsoever to do with an employee's "commute," *i.e.*, whether it was farther or closer to his/her new assignment. The arbitrator rejected the Unit's interpretation of Article X, Section B.3, concluding that the term "home" cannot just be inserted into the provision, and noting that he had no authority to add, subtract, amend, or delete any provision contained in the document as bargained and agreed upon by the parties. *Id.* at 20. The arbitrator found that the term "home," as a location from which any calculation can be made for reimbursement under Article X, Section B.3, is not explicitly or even implicitly referenced in the language of this provision.

6

The arbitrator concluded that "the application of Article X, Section B.3 does not require the inclusion of the commuting distance from an employee's home to the assignment site, but only from the former assignment to the new assignment locations." *Id.* at 17. Stated differently, Article X, Section B.3, "clearly identifies that the computing distances are between the assignment sites and does not include the location of an employee's home in the calculation." *Id.* According to the arbitrator, the Unit's interpretation "ignores the intended purpose of Article X, Section B.3 as a displacement mileage benefit and that the [CBA] requires only the computation between the previous and new work assignment sites and does not include a third point of reference, *i.e.*, the employee's home to determine the measurement for this benefit." *Id.* at 23. The arbitrator concluded that,

> *from a reading of* this Article, the statement contained therein *and the clear meaning* from the bargained phrase '. . . and if the new assignment is more than twenty (20) miles, roundtrip, from the previous assignment,' there can be no doubt that *the parties only intended* the use of the two worksites to determine the measurement for this benefit and did not include the distance commuting to the site from an employee's home.

*Id.* at 19-20 (emphasis added).

The arbitrator also emphasized that the provision had been applied consistently since 1997 without considering employees' home locations, and then, without any advance notice, the Unit unilaterally refused to provide the displacement mileage benefit to employees in the 2018-19 contract year based on the fact that the realigned employees' new assignments were closer in distance to their "homes" than their previous assignment locations. *Id.* at 14. The arbitrator found that this new interpretation was inconsistent with past practice.

7

Addressing the 2007 Arbitration Case, the arbitrator found that Arbitrator Dissen decided an issue unrelated to that which is involved here. *Id.* at 18. In the 2007 Case, Arbitrator Dissen focused on whether there were any provisions of the CBA or IRS regulations that would limit the availability of reimbursement under Article X, Section B.3. *Id.* at 15, 18. The arbitrator further distinguished the 2007 Arbitration Case, noting that the employee in that case did not request reimbursement for the mileage between his former assignment to his new assignment. Instead, the arbitrator looked at the calculation measured from the employee's home to his new assignment. *Id.* at 14-15. The arbitrator concluded that, in any event, his interpretation and Arbitrator Dissen's interpretation of Article X, Section B.3 were consistent, *i.e.*, they both agreed that it required the actual calculation between the previous and new assignment locations, without regard to the distance from the employee's home to the new assignment. *Id.* at 17.

Regarding the Unit's contention that both Article X, Section B.3 and Article XII, Section B regulate the same working conditions of mileage reimbursement, which is only applicable to itinerant employees, the arbitrator found that, under Article XII, Section B, the parties agreed to provide a travel reimbursement *for itinerant employees* who travel between their work locations and back to the base location. *Id.* at 21. That CBA provision, according to the arbitrator, was intended to reimburse the employee for authorized miles traveled at the allowable Internal Revenue Service (IRS) rate, which is a reportable income event and is "*clearly differentiated from the value of the benefit provided under Article X, Section B.3*." *Id.* (emphasis added). The arbitrator explained that,

> notwithstanding the word choice, Article XII, Section B. (Travel Reimbursement) applies to 'itinerant' employees who travel between work sites and seek a reimbursement for

8

work related miles traveled. Article X, Section B.3 uses the measurement of miles between work assignments as a means to determine the amount of the benefit intended by this provision to defray the cost of the relocation.

*Id.* at 22.

The arbitrator further found that Grievants were not "itinerant" employees because they did not travel for work, and they did not seek any reimbursement under Article XII, Section B for travel from home to work. *Id.* at 11, 21. Therefore, the arbitrator concluded, "the mileage computation analysis imposed by the [Unit] is in opposition to that which is claimed by the Association." *Id*. at 17. That is, Article XII is irrelevant to this case.

In conclusion, the arbitrator found that Article X, Section B.3 must be given its "full meaning and application" to provide a "displacement mileage benefit" derived from "the measurement between two location sites only, namely the previous and new work assignments" due to the realignment if greater than 20 miles roundtrip, "regardless of the commuting distance the employees had to travel *from their homes*." *Id.* at 22, 25 (emphasis in original).

**Trial Court's Decision**

Following the Award, the Unit filed a petition for review in the trial court, arguing, *inter alia*, that the Award failed to draw its essence from the CBA because: it effectively compensated employees for driving from their homes to work at the start of the workday in direct contradiction of Article XII, Section B of the CBA; and the arbitrator exceeded his powers by amending the CBA to expressly award miles from home to work, which was expressly prohibited by Article XII, Section B of the CBA and applicable law.

By order dated September 25, 2020, the trial court vacated the Award, concluding, in relevant part, that the arbitrator's decision was not rationally related to

9

the terms of the CBA. In an opinion supporting the order, the trial court found that the arbitrator erroneously "recharacterized" the term "reimbursement" in Article X, Section B.3 to mean "benefit" when, in the trial court's view, "the *language of the CBA clearly indicates that* the relevant sections are referring to 'reimbursement' for actual miles driven by itinerant employees and nowhere is the word 'benefit' used." (Trial ct. op. at 6) (emphasis added). Rejecting the arbitrator's interpretation of the CBA, the trial court concluded "[t]he interpretation of the language of the CBA by the [a]rbitrator resulting in the creation of a 'mileage benefit' to employees that are not actually engaging in any [work] travel *is not a rational interpretation*." *Id*. at 7 (emphasis added).

The trial court further found that the arbitrator "*essentially ignore[d] the language of Article XII that clearly indicates*, 'At no time is an employee reimbursed for mileage between home and base.'" *Id.* at 6 (emphasis added). The trial court found that Article X, Section B.3 "*does nothing more than* prescribe that the original assignment location should continue to be the 'base' location for mileage 'reimbursement' purposes" and *"[t]he CBA clearly indicates that* the only employees being reimbursed mileage are 'itinerant' employees." *Id.* (emphasis added). The trial court concluded that the arbitrator's interpretation of the language of the CBA, which "create[d] a 'mileage benefit' to employees that [were] not actually engaging in any travel *is not a rational interpretation*." *Id.* at 7 (emphasis added). The trial court concluded, on the contrary,

> it creates a situation squarely at odds with the language of the CBA that indicates employees are not entitled to reimbursement for travel between home and work. The [a]rbitrator's Award clearly does not rationally flow from the terms of the CBA as *Article X.B.3 and Article XII.B are not applicable to Grievants whatsoever*. The *unambiguous*

10

*language of the CBA makes it clear that Grievants are not entitled to travel reimbursement.* The court finds that the [a]rbitrator's Award is not rationally derived from the CBA and fails to logically flow from its terms.

\* \* \*

For the reasons discussed above, the Petition to Vacate Arbitration Award is granted, as [the a]rbitrator exceeded his power pursuant to 42 Pa.C.S. [§]7314(iii) *by reading a mileage "benefit" into the CBA where only a mileage reimbursement is outlined by the specific terms at issue. The express provisions of the CBA do not coincide with the [a]rbitrator's Award.* The Award should be vacated because it is not rationally based on the language of the CBA.

*Id.* (emphasis added).

## Analysis

We begin with this Court's narrow standard of review of a grievance arbitration award under the Public Employe Relations Act.[4] Our Supreme Court has held that a reviewing court must accord great deference to the award of an arbitrator chosen by the parties. *State System of Higher Education (Cheyney University) v. State College University Professional Association (PSEA-NEA)*, 743 A.2d 405, 413 (Pa. 1999). In the vast majority of cases, an arbitrator's decision is final and binding upon the parties. *Id.* The narrow exception to this finality doctrine is the so-called "essence test." *Id.* In applying the essence test, a reviewing court conducts the following two-prong analysis:

First, the court shall determine if the issue as properly defined is within the terms of the collective bargaining agreement. Second, if the issue is embraced by the agreement, and thus, appropriately before the arbitrator, the arbitrator's award will be upheld if the arbitrator's

---

[4] Act of July 23, 1970, P.L. 563, *as amended*, 43 P.S. §§1101.101 – 1101.2301.

11

> interpretation can rationally be derived from the collective
> bargaining agreement. That is to say, a court will only vacate
> an arbitrator's award where the award indisputably and
> genuinely is without foundation in, or fails to logically flow
> from, the collective bargaining agreement.

*Id.* A reviewing court does not review the merits of an arbitration award. *Westmoreland Intermediate Unit #7 v. Westmoreland Intermediate Unit #7 Classroom Assistants Educational Support Personnel Association, PSEA/NEA*, 939 A.2d 855, 863 (Pa. 2007). A court may not disturb an award even if it is "manifestly unreasonable." *Id.* We consider the Association's appeal with the above principles in mind.

### First Prong –Whether the Issue Decided by the Arbitrator Was Embraced by the CBA

Under the first prong of the essence test, the Court must determine whether the issue decided was embraced by the CBA and, thus, properly before the arbitrator. Here, the trial court concluded that a claim for some type of compensation under Article X, Section B.3 is within the terms of the CBA and, therefore, the issue raised by Grievants and addressed by the arbitrator was contemplated within the terms of the CBA. We agree with the trial court that the first prong of the essence test was satisfied.

Article XVI of the CBA defines a "grievance" as "a complaint or dispute by any aggrieved person about the meaning, interpretation, or application of any provision of this agreement." (R.R. at 33a.) The issue of whether Article X, Section B.3 provided a mileage benefit to compensate displaced employees who had been involuntarily realigned into a new position more than a 20-mile roundtrip distance from their previous assignment is an issue that arose out of the interpretation and application of Article XVI of the CBA. Moreover, the arbitrator found that the issue was properly

12

before him, and that finding is entitled to deference. *See Millcreek Township School District v. Millcreek Township Educational Support Personnel Association*, 210 A.3d 993, 1004 (Pa. 2019) ("[W]e hold that the reviewing court must give deference to the arbitrator's interpretation of the CBA including for purposes of the first prong of the essence test.").

### Second Prong—Whether the Arbitrator's Award Was Rationally Derived From the CBA

Under the second prong of the essence test, the Award must be upheld if it can rationally be derived from the CBA. In conducting this analysis, courts must be mindful that "[t]he words of the CBA are not the exclusive source of rights and duties. . . . The arbitrator is authorized to make findings of fact to inform his interpretation of the CBA." *Id*. at 1006 (quotations omitted). Further, "even though an arbitrator is not permitted to ignore the CBA's plain language in fashioning an award, *the arbitrator's understanding of the plain language must prevail*. *A reviewing court should not reject an award on the ground that the arbitrator misread the contract*." *Id.* (quotations omitted) (emphasis added). All that is necessary is that the arbitrator's interpretation "can in any rational way be derived from the agreement, viewed in light of its language, its context, and any other indicia of the parties' intention." *Id.* at 1002 (quotations omitted).

With this deferential standard in mind, we conclude that the Award satisfied the second prong of the essence test, and the trial court erred in holding to the contrary.

At the outset, we note that the trial court misstated the issue. The trial court framed the issue as whether the arbitrator "exceeded his powers" by "*awarding Grievants mileage from home[s] to and from work* in his Arbitration Award." (Trial

13

ct. op. at 3) (emphasis added). Contrary to the trial court's account, the arbitrator did *not* award Grievants mileage *from their home to and from work*. Rather, based on his interpretation and understanding of Article X, Section B.3, the arbitrator found Grievants were entitled to a "displacement mileage benefit," which he determined is calculated by measuring the distance between two location sites only, namely Grievants' *previous and new work assignments*. The arbitrator specifically found that an employee's *home* location was not relevant for purposes of deciding *whether to provide* a "displacement mileage benefit" under Article X, Section B.3, or for purposes of *calculating* the benefit. For each day of work, the arbitrator found that Grievants were entitled to receive mileage compensation *for the distance between the former and new work assignments* (so long as that distance is greater than 20 miles) as a "displacement mileage benefit" under Article X, Section B.3.

Next, the trial court found that the Award was not rationally related to the CBA because the "terms of the CBA clearly indicate that employees are not to be reimbursed for miles traveled between home and work." (Trial ct. op. at 7.) The trial court charged the arbitrator with "ignoring" the language of Article XII, which "clearly indicates, '[a]t no time is an employee reimbursed for mileage between home and work.'" *Id.* at 6 (citing Article XII, Section B). The trial court found that the CBA clearly indicates that only itinerant employees are reimbursed for mileage and none of Grievants are itinerant employees. *Id.* Again, the trial court's rationale is factually flawed because the Award did not reimburse Grievants "for miles traveled between home and work." Therefore, this factually flawed reasoning did not support vacating the Award.

Significantly, and seemingly fundamental to the trial court's finding that the Award did not rationally flow from the CBA was its disagreement with the

14

arbitrator's understanding and conclusion that Article X, Section B.3 provided a "displacement mileage benefit," which was intended to offset the results from a realignment. *See* Award at 19. The trial court disagreed with the arbitrator's assessment for the reason that "nowhere is the word 'benefit' used" in Article X, Section B.3. (Trial ct. op. at 6.) The trial court concluded instead that "Article X, Section B.3 does nothing more than prescribe that the original assignment location should continue to be the 'base' location for mileage reimbursement purposes." *Id.* In other words, the trial court disagreed with the arbitrator's interpretation and substituted its own interpretation for that of the arbitrator. By doing so, the trial court clearly exceeded the limited scope of arbitral review.

In *Millcreek*, a school district was a party to a CBA with a union representing a bargaining unit consisting solely of custodians for the school district's properties. The CBA provided that "[n]o work of the bargaining unit shall be subcontracted for the life of the CBA." *Millcreek*, 210 A.3d at 996. During negotiations for a successor agreement, the school district submitted a proposal that included the elimination of the existing "no subcontracting" provision. *Id.* The union rejected the proposal. *Id.* A month later, while negotiations were still ongoing, the school district issued a request for proposals (RFP) for the provision of custodial services. *Id.*

Upon learning that the school district had issued an RFP to subcontract the bargaining unit's work, the union filed a grievance contesting the RFP. *Id.* at 997. The grievance eventually proceeded to arbitration, where an arbitrator determined the school district violated the parties' CBA. *Id.* at 998. Noting that the school district had not entered into a subcontract with the successful bidder, the arbitrator determined that the question of whether the school district's actions constituted subcontracting fell

15

within the confines of the CBA. *Id.* at 999. Relying on witness testimony and the parties' bargaining history to inform his interpretation of the CBA, the arbitrator concluded subcontracting began when the school district decided to pursue outside contracting options, and that the school district's actions violated the CBA. *Id.* The school district filed a motion to vacate the award, which was rejected by the trial court. *Id.* However, this Court reversed the trial court's decision, prompting an appeal.

In reversing our decision, the Supreme Court concluded that we erred in substituting our judgment for that of the arbitrator, who was authorized to make findings of fact and to interpret undefined terms in the CBA. *Millcreek*, 210 A.3d at 1006. The arbitrator had found that the district issued an RFP on subcontracting custodial services as a bargaining tactic in its effort to eliminate the parties' no subcontracting provision. *Id.* at 1006. The Supreme Court explained that, when reviewing the propriety of the award, the court was required to rely on the arbitrator's findings of fact, including his determination that the parties' no contracting provision was intended to prohibit the process of subcontracting. *Id.* at 1006, 1014. The Supreme Court further explained that the arbitrator's interpretation and resulting award reflected a reading of the CBA "that was informed by his understanding of the parties' history and the context." *Id.* at 1006. Accordingly, the Supreme Court concluded the award was rationally derived from the parties' CBA, and found that this Court had

> erred in substituting its own interpretation of the contract for the arbitrator's interpretation where the latter rationally derived from the [CBA]. It erred further in concluding that the arbitrator's award violated a dominant public policy. Under the highly deferential essence test and its exceptionally narrow public policy exception, when reviewing the propriety of the arbitration award, the Commonwealth Court was required to rely on the arbitrator's Findings of Fact, including his view that the parties intended

16

to prohibit the process of subcontracting. Because the Commonwealth Court did not adhere to this standard, we reverse.

*Id.* at 1013.

An important takeaway from *Millcreek* is the Supreme Court's emphasis upon the reviewing court's obligation to rely on the arbitrator's findings of fact, including the meaning of the CBA that was informed by his understanding of the parties' history and the context. Moreover, contrary to the trial court's viewpoint that the arbitrator was required to base his decision on "purely an interpretation of the relevant language," in *Millcreek*, the Supreme Court emphasized that the words of the CBA are not "the exclusive source of rights and duties." *Id.* at 1006. It is not necessary for an award to reflect the narrowest possible reading of the CBA's plain language. *Id.* The essence test has always contemplated that arbitrators would consider the parties' agreement "in light of its language, its context, and any other indicia of the parties' intention." *Id*. at 1002.

Here, the arbitrator performed a similar analysis of the issue before him, considering the evidence presented at the hearing, and the parties' history of treating the payments to displaced teachers, while calculated based on mileage, as a ***displacement mileage benefit*** rather than a travel reimbursement for itinerant employees. (Award at 22-23.) The Association's witness, Mr. Lugg, explained that when a teacher loses (*i.e.*, "is bumped from") his/her classroom, that teacher must go through a "bumping and bidding" procedure to receive a new assignment. (R.R. at 57a.) If the realignment results in a change of work assignment, which increases the driving distance from the former assignment to the replacement assignment and that distance is over 20 miles roundtrip, the affected employee is entitled to receive a bumping mileage compensation benefit for the roundtrip for a period of one year. *Id.*

17

Mr. Lugg explained that the benefit under Article X, Section B.3 is distinguishable from mileage "reimbursement" in Article XII, which is meant to reimburse itinerant *i.e.*, traveling, employees for miles actually traveled for Unit business. *Id.* at 58a-59a. Mr. Lugg explained that employees use different forms to submit requests for reimbursement for business travel under Article XII and for the Article X, Section B.3 benefit. *Id.* Mr. Lugg also testified that historically, since 2007, and until the 2018-19 school year, employees who requested the bumping mileage compensation benefit received it even though their new assignments were closer to their residential homes. *Id.* at 61a. The arbitrator clearly credited this testimony, as was his prerogative, and considered it when interpreting Article X, Section B.3.

Like this Court in *Millcreek*, the trial court erroneously rejected the arbitrator's credibility determinations, his findings of fact and his interpretation of Article X, Section B.3 and substituted its own interpretation. The trial court found that Article XII, Section B of the CBA allows mileage reimbursement ***only to itinerant employees***, and because Grievants were not itinerant, they were not entitled to mileage reimbursement under any other provision of the CBA, including Article X, Section B.3. The problem with the trial court's analysis is this: it disregarded the arbitrator's finding and conclusion that Article X and Article XII addressed two completely different situations. That is, the arbitrator concluded that Article X provided a benefit for involuntarily displaced employees, while Article XII addressed reimbursement for mileage for itinerant employees who travel to different schools for work. Because the arbitrator interpreted the phrase "and if the new assignment is more than twenty (20) miles, roundtrip, from the previous assignment," and the terms "new assignment," "previous assignment," and "home" and ascribed them "clear meanings," we cannot say that his Award was not rationally related to or failed to flow from the terms of the

18

CBA. The arbitrator's interpretation, as off beam as it may have appeared to the trial court, was the arbitrator's interpretation of the CBA, an interpretation that the parties bargained for and to which they agreed to be bound.

Because *Millcreek* instructs that a reviewing court lacks the authority to reject the arbitrator's findings of fact and his interpretation of disputed contract language in this manner, we are constrained to conclude that the trial court erroneously vacated the Award and its decision is contrary to law.[5]

## Conclusion

In conclusion, we cannot say that the Award is indisputably without foundation in or fails logically to flow from the CBA. The arbitrator's decision considered language of the CBA and decided upon its meaning. The Award was rationally derived from the CBA as informed by the arbitrator's understanding of "the

---

[5] The Unit argues that this Court should consider that the arbitrator disregarded the "final and binding" 2007 Arbitration Case, interpreting the same language which is presently at issue. (Unit's Br. at 15.) It is true that an arbitrator's award has precedential value and must be followed in future arbitrations involving the same contract language. *American Federation of State, County & Municipal Employees, District Council 84, Local 297, AFL-CIO v. Board of Public Education of School District of Pittsburgh*, 503 A.2d 1047 (Pa. Cmwlth. 1986). However, as the Association points out, the section of the 2007 Arbitration Case relied on by the Unit on page 15 of its brief merely states that the Unit might have made a "more plausible" argument had it not focused on the fact that the grievant in that case lived in the same location as the first assignment for purposes of Article X, Section B.3. But, because this argument was not raised before Arbitrator Dissen and was inapplicable to the case he was considering, Arbitrator Dissen made no final determination regarding the current grievance. Merely because he believed that such an argument was "more plausible" does not mean that he endorsed or adopted that argument. It simply was not germane to the issue before him and played no part in the ultimate holding of the case. It is thus considered *dicta*, not binding precedent. Judicial *dictum* has been defined as "[a]n opinion by a court on a question that is directly involved, briefed, and argued by counsel, and even passed on by the Court, but that is not essential to the decision." *City of Lower Burrell v. City of Lower Burrell Wage & Policy Commission*, 795 A.2d 432, 437 (Pa. Cmwlth. 2002). Binding precedent only applies to issues actually raised, argued, and adjudicated, and only where the decision was necessary to the determination of the case. *Ario v. Reliance Insurance Company*, 980 A.2d 588, 598 (Pa. 2009). Accordingly, contrary to the position of the Unit, the arbitrator here was not obligated to adopt or follow *dicta* contained in the 2007 Arbitration Case.

parties' history and the context." *Millcreek*, 210 A.3d at 1006. That the trial court may have reached a different result is of no moment, even if it viewed the Award as manifestly unreasonable. *Westmoreland Intermediate Unit #7*, 939 A.2d at 863.

Because the trial court erred in granting the Unit's petition to vacate the arbitration award with respect to Grievants' entitlement to a displacement mileage benefit under Article X, Section B.3, we reverse its order and remand for entry of an order denying the Unit's statutory appeal in favor of the Association.

_____

PATRICIA A. McCULLOUGH, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Riverview Intermediate Unit #6      :
                                :   No.  1134 C.D. 2020
            v.                :
                                :
Riverview Intermediate Unit #6      :
Education Association,             :
                 Appellant    :

## ***ORDER***

AND NOW, this 7th day of June, 2021, the order of the Court of Common Pleas of Clarion County dated September 25, 2020, is REVERSED, and the above-captioned matter is REMANDED for entry of an order in favor of Riverview Intermediate Unit #6 Education Association.

Jurisdiction relinquished.

 

_____
PATRICIA A. McCULLOUGH, Judge